GOTHARD, Judge.
This appeal is from a judgment in favor of the defendant physician in a medical malpractice suit.
Robert A. Bourgeois received a bone graft to his left wrist in surgery performed at Ochsner Foundation Hospital by Dr. Gordon McFarland, an orthopedist specializing in hand surgery, on May 17, 1983. The graft required harvesting bone from the iliac crest of the left hip, in the course of which the lateral femoral cutaneous nerve was injured, causing pain and numbness in Bourgeois’ left lateral thigh. A second surgery was performed on January 11, 1984 by Dr. David Kline, a neurosurgeon, to relieve the pain by severing the previously injured nerve. The numbness is apparently permanent.
While under Dr. Kline’s care Bourgeois began to complain of low back pain. As the back pain continued and limited motion and discomfort in the left wrist had not disappeared, in October, 1984 Bourgeois consulted a new orthopedic surgeon, Dr. Robert Fleming. Dr. Fleming determined that the bone graft had not taken and performed a second graft successfully at West Jefferson Hospital on October 25, 1984.[1] Dr. Fleming used conservative treatment on the back until it was apparent that surgery was needed and then, on June 9, 1988, performed a lumbar fusion. Bourgeois had held a responsible job as captain of a crane vessel at Avondale. He returned to work briefly in 1984 after the second surgery but was unable to perform the physical activity the position entailed, and has not been employed since that time.
Bourgeois submitted a claim under the Medical Malpractice Act, LSA-R.S. 40:1299.41 et seq., alleging negligence of Dr. McFarland in allowing a gouge to slip into the soft tissue surrounding the hip, injuring the lateral femoral cutaneous nerve, and negligence in treating him after the surgery. After a medical review panel decided adversely to Bourgeois, on November 27, 1985, he filed suit against McFarland and Ochsner.[2] A jury trial was held September 12 through 15, 1988. The court dismissed Ochsner Clinic and Hospital from the suit on a directed verdict at the close of the plaintiff’s case. The jury found in favor of Dr. McFarland and this appeal followed.
The plaintiff raises the following issues: 1) whether Dr. McFarland was negligent, amounting to malpractice, in letting the gouge slip into the soft tissue; and 2) whether the surgeon was negligent in his treatment following the operation.
Bourgeois also assigned seven errors, five of which relate to the conduct of the trial: that the trial court was in error 1) in excluding the entire deposition of Dr. McFarland taken on June 19, 1985; 2) in permitting defendants’ counsel to edit out portions of Dr. J. Ollie Edmunds’ deposition; 3) in permitting the questioning of each member of the Medical Review Panel concerning the panel’s finding, his oath and other matters relating to the medical review; 4) in permitting the introduction of the video deposition of Dr. Frank 0. Petko-vich; and 5) in its charge to the jury. Assignment of error (6) was the judge’s sustaining Ochsner Foundation Hospital and Clinic’s motion for a directed verdict. The seventh is the jury’s returning a verdict in favor of the defendant.
The law regarding medical malpractice claims against a specialist is summarized in Douzart v. Jones, 528 So.2d 602, 603 (La.App. 2nd Cir.1988), as follows:
In a medical malpractice action against a physician-specialist, the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians within the involved medical specialty and is not restricted to proof of the standards of care and skill within the defendant’s com *1231 munity or locality. LRS 9:2794A(1); Ardoin v. Hartford Acc. & Indem. Co., 360 So. 2d 1331 (La.1978).
The plaintiff must also prove that the defendant either lacked the expected degree of knowledge and skill or failed to use reasonable care and diligence and his or her best professional judgment, in the particular application of that skill in the undertaking. Plaintiff must prove, as well, that the injury complained of was the proximate result of the defendant’s breach of the professional duty. LRS 9:2794A(2), (3).
The doctor’s conduct is evaluated in terms of reasonableness under the circumstances existing when the professional judgment is exercised. Neither a general practitioner nor a specialist is held to a standard of perfection or evaluated with the benefit of hindsight. See and compare Matthews v. La. State Univ. Medical Center, 467 So.2d 1238 (La.App. 2d Cir.1985).
See also the Supreme Court’s extensive consideration of the physician’s duty of care in Pitre v. Opelousas General Hosp., 530 So.2d 1151 (La.1988).
NEGLIGENCE IN SURGERY
The harvesting procedure, in brief, entails finding the iliac crest or top of the pelvic bone, then making an incision into the skin and underlying tissue to expose the bone. The muscles and tendons are then peeled away from the iliac crest and held by self-retaining or assistant-held re-tractors. The surgeon then extracts the needed bony material with a gouge, which is a type of bone knife similar to a carpenter’s chisel, which he taps with a mallet.
The plaintiff alleges that Dr. McFarland caused damage to his femoral cutaneous nerve by letting an instrument slip into the soft tissue, partially severing the nerve. Dr. McFarland admitted that the gouge slipped when he was preparing to extract some bone for a plug to be inserted in the wrist. He testified he had made a two-inch incision at the iliac crest. The patient was overweight, and the hole was about two inches deep. Dr. McFarland continued to describe the surgery as follows:
[Y]ou have belly muscles called inferi- or oblique, that generally roll over. Except in very thin people, that has to be pulled out of the way, not necessarily cut out of.the way.
Then you make an incision on the bone, on the surface of the bone, right down on it, and start peeling off the tendons and muscles until you retract it from the side; and you pack it away and put re-tractors in to hold it, stretched out of the way so that it doesn’t keep draping back over the surface you are operating on.
He continued, demonstrating with instruments on a skeleton:
... [W]e had a relatively short incision and a deep hole — he was fat — with self-retaining retractors holding the wound apart and holding the muscle apart, pulled away from the bone. And the problem was, working from a distance, with a soft bed of giggely fat, to hold the gouge very firmly and steadily on the crest of the ilium....
Anyway, the hand is high, resting on the belly fat or the skin and the belly, and pressing very hard on this crest. Now this crest is curved slightly, but definitely curved. So you are pressing hard, and as I hit it with the mallet to start it ... it bounced and went like that. It was my fingers that pushed it into the tissues, not the hammer; so it went like this. And it could not have gone any further than where I was holding it.
He stated further that he was exercising more care than usual because he was holding the gouge firmly on the iliac crest to prevent its shifting.
Dr. McFarland admitted that in his 1985 deposition he had said that Bourgeois had discomfort and numbness in the leg “as soon as he awakened.” However, after reading the plaintiff’s and Mrs. Bourgeois’ testimony, he felt he had made the statement in error, as they testified that the extreme pain began the day he returned home. His assistant, Dr. Lessenberry, saw Bourgeois five days after surgery because of his complaints of pain and noted in his report that he suspected a neuropraxia or an irritation of the left femoral cutaneous *1232 nerve, with severe pain that was worsening. That nerve, a sensory nerve, runs on the inside of the pelvis within a muscle, thence into the thigh.
Dr. McFarland saw his patient on June 6, 1983 and noted:
I’m sure at the time of bone graft harvest, the lateral femoral cutaneous nerve was damaged. It was not seen at surgery. I know of nothing to do now except wait for a recovery.
He testified that the gouge had slipped off in an area where the lateral femoral cutaneous nerve was located. He admitted having said in the deposition that he thought the nerve was “severed some”, that is, that it was partly intact or else Bourgeois would not have had the pain. He testified at trial that after seeing Dr. Kline’s histologic report, showing no evidence of a focal injury, that he realized the slip had nothing to do with the problem. He suspected retraction had caused a he-matoma, which grew, causing the nerve to stretch and the pain to become worse.
Dr. McFarland admitted that he had not noted the gouge’s slip in the surgery report (dictated by Dr. Lessenberry but approved by himself). He stated that he had not mentioned it because he did not think it had caused any problem; the incident was not reported anywhere in the hospital record.
Dr. Kline’s subsequent surgery consisted of locating the lateral femoral cutaneous nerve, removing several sections of it and then coagulating the ends of the remaining nerve with hipolar forceps to prevent regrowth. He found “an area that was discolored, more narrow than the rest of the nerve and slightly firmer than the rest of the nerve.” He concluded that “something had happened to the nerve at that point.” He studied sections of the nerve in his own laboratory at L.S.U. School of Medicine and found:
... [BJasically what they showed was a nerve that had degenerative change in it but then also regenerative change. In other words, some type of injury had occurred to it, and it was trying to correct itself. So the fibers were smaller than they should have been, the myelin or the covering and the insulation on them was poor.
He stated it was possible that the nerve had been stretched:
Most likely, because the histologic picture was most compatible with that, as was what I found at the operating table. Either an area of contusion over about a length of an inch, which is like a bruising or a stretching over that length, because of that area of slight narrowing, discoloration, and slight firmness, because the histologic picture sort of fits with that. Because you think of a contusion, and there is some stretch with that or pulling on it can do it. You can’t separate those out by looking at the nerve histologically.
He was not asked whether it could have been struck with an instrument. However, Dr. Fleming, who later performed a spinal fusion on Bourgeois, testified that a contusion could be produced by a direct blow from an instrument:
Q. ... If the nerve, if you found something such as the lateral cutaneous nerve — and I know you are not a neurosurgeon or a neurologist — but if you were looking at that nerve and you found that it was somewhat flattened; it was slightly firmer and maybe discolored to some degree, would you feel that it had been injured by some sort of trauma, such as a laceration?
A. I would have said it would have been injured by some sort of trauma. Insofar as to say, if it had been, in my opinion, involved as a result of a laceration, I would expect to see a swelling of the nerve or a so-called neuroma. If it — but in answer to your question, I would say it could be as a result of trauma but not—
Q. How about a bruise?
A. Bruise? A stretch injury is a bruise. When I say stretch as a result of retraction, I am speaking, that contuses a nerve, yes.
Q. If it was struck by an instrument, say during an operation, but not cut, but contused, could that cause that?
*1233 A. Yes, sir.
The plaintiffs expert witness, Dr. Lee C. Detenbeck, a board certified orthopedic surgeon, testified by deposition. He opined that the nerve could have been partially cut and healed with scar tissue, as a result of a blow or pressure from retractors holding the tissue away from the bone.
The three members of the Board of Review Panel, all orthopedic surgeons with a subspecialty of hand surgery, Dr. Robert Chuinard, Dr. Harold Stokes, and Dr. J. Ollie Edmunds, testified by deposition for the defense. They had not known of the gouge’s slip when the review board panel convened. Dr. Chuinard testified he believed the probable cause of the nerve damage was stretching and contusion in the process of retracting the muscles; he felt it would be nearly impossible to strike the nerve directly because of its location. Dr. Edmunds stated that in the cases he knew of where there were complaints related to the lateral femoral cutaneous nerve he presumed the problem was related to a stretch or swelling or hematoma, “or it could have been related to direct injury by some instrument, perhaps an osteome. ” [Emphasis supplied.] After reviewing the records in Bourgeois’ case, he had not reached an opinion as to what caused the injury to the nerve. Dr. Stokes said that he could not say with any degree of certainty what caused the injury but could rule out some possibilities, including direct injury to the nerve. He stated:
If that had been the case, the patient would not have had a free period before the onset of his symptoms. I think he would have awakened with symptoms. I believe that — and therefore, I don’t think the nerve was cut....
The plaintiff alleges that Dr. McFarland failed to exercise the skill of a physician practicing the specialty of orthopedic surgery by making too small an incision, only two inches,[3] in an obese man. Assuming that the damage was due to the knife’s slipping, the appellant’s counsel asserts that good operative procedure would require a much longer incision for the surgeon to have a clear view of the operative field. Each expert estimated the length of incision in his own practice to be longer than two inches when the patient was a large heavy man. Dr. Fleming testified he would use an incision as long as three inches. Other estimates were three to four inches by Dr. Hugh Tullos of Baylor Medical School and Dr. Roy Haddad of Tulane Medical School, to a limit of six inches by Doctors Stokes, Edmunds, and Chuinard.
A further allegation of deviation from the standard of care is Dr. McFarland’s delayed referral to a neurosurgeon, while relying on conservative treatment, and allowing his patient to remain in pain over a period of months following the surgery. The operation took place on May 16, 1983, while Dr. Kline’s surgery on the cutaneous nerve relieved his pain almost eight months later, on January 11, 1984. Almost five months elapsed between the first surgery and the first referral for consultation with a neurologist on October 6, 1983. Except for a few weeks of relief from nerve blocks in July, Bourgeois experienced extreme pain in his left leg. He favored the left leg in walking, limped, and began having low back pain, which ultimately resulted in a spinal fusion. While clearly the damage to the femoral cutaneous nerve did not cause the back problem, both Dr. Kline and Dr. Fleming testified that the limp probably made preexisting arthritic changes in the facet joints of the spine symptomatic.
While the physician witnesses testified that nerve injuries smiliar to Bourgeois’ normally resolved on their own, and aggressive treatment was rarely indicated, two of the defendants’ witnesses testified that they would have an earlier consultation. Dr. Chuinard testified that, in similar circumstances and depending on the severity of the complaints, he would ask for a second opinion as early as a week after the surgery and no later than six months. Dr. *1234 Stokes would make a referral in from six to sixteen weeks.
The defendants, urge that damage to the lateral femoral cutaneous nerve is a recognized complication of bone harvesting for use in a graft. However, when the witnesses were questioned as to its frequency, it became apparent that injuries producing symptoms as severe as Bourgeois’ are very rare. Dr. Tullos testified that he had not ever damaged that nerve in more than one hundred surgeries. Dr. Chuinard estimated that he had done more than 500 procedures, had had two patients who experienced a similar nerve problem, but those recovered without surgery. Dr. Haddad, with 500 to 1000 surgeries, had not had a case. Dr. Fleming had resected the lateral femoral nerve of two patients, apparently neither damaged by his own previous surgery, in twenty years of practice. Dr. Ed-munds’ only case, in 1000 surgeries, occurred in surgery on a fractured pelvis and hip. Dr. Stokes had had patients with injuries to the femoral cutaneous nerve but none required extirpation of the nerve. We can only conclude that the injury that befell Bourgeois is not a common complication of surgery, such as bleeding or infection, and does not occur in the absence of deviation from the standard of care.
The appellant assigned as error the court’s allowing the videotaped deposition of Dr. Frank O. Petkovich to be introduced at trial over objection of plaintiff’s counsel. Trial was set for Monday, September 12. Notice of the video deposition to be taken in St. Louis, Missouri at 1:30 p.m. on Friday, September 9, was handed to appellant’s counsel on the afternoon of September 8, less than twenty-four hours before. La.C.C.P. art. 1438 provides that, “A party desiring to take the deposition of any person upon oral examination shall give reasonable notice in writing to every other party to the action.... ” In the recent case of Heaton v. Gulf Intern. Marine, Inc., 536 So.2d 622 (La.App. 1st Cir.1988), four days’ notice to a Houma resident of a deposition to be held in New Orleans was held not to be reasonable. In the case before us, the trial judge overruled the objection, stating that a motion to suppress should have been filed prior to the deposition. Article 1453 provides that “all errors and irregularities in the notice for taking a deposition are waived unless written objection is promptly served upon the party giving the notice.” Counsel objected orally to the defendants upon receipt of the notice and later filed a written motion to suppress, dated September 9 but marked by the clerk of court as filed September 15. The testimony was damaging to the plaintiff as he was not able to interrogate the witness. We find that the ruling was an abuse of the court’s discretion, inasmuch as the defendants failed to comply with the mandate of article 1438 to provide reasonable notice. Consequently, we have excluded the deposition testimony of Dr. Petkovich from our review of this case.
Mindful that a jury’s finding of fact will not be disturbed unless it is clearly wrong, we have concluded that the jury in this case was in error in determining that Dr. McFarland did not fail to meet the standard of care for orthopedic surgeons. We find that Robert Bourgeois carried his burden of proving that Dr. McFarland’s deviation from the standard in performing the surgery caused the damage to the lateral femoral cutaneous nerve and that the plaintiff’s limping to avoid putting weight on the affected leg caused latent back problems to become symptomatic. In the recent case of Howell v. Iacona, 505 So.2d 821 (La.App. 2nd Cir.1987), the court said, at 823:
We recognize that medicine is an inexact science at best, but in the courts of law we must be concerned not with concrete and irrefutable truths, but rather the proper distribution of liability, based on the preponderance of the evidence. The plaintiff’s burden is not that he prove his case beyond all doubt, or even beyond a reasonable doubt, but merely by a preponderance of the evidence. A showing that his position is 51% likely is acceptable. He need not negate all viable theories, but only show that his position is more probable than not. Baker v. Beebe, 367 So.2d 102 (La.App. 4th Cir. *1235 1979), writ. denied, 368 So.2d 135 (La.1979).
We base our determination on the totality of circumstances. The gouge slipped off the bone into surrounding tissue. According to a number of experts, the description of the extirpated nerve section fit several possibilities: a hematoma, a stretch injury from retraction, and a contusion. A contusion can result from the direct blow of an instrument. No witness was willing to say with certainty what caused the problem. Several physicians testified that in performing surgery on a man of Bourgeois’ build they would make a wider incision to better expose the bone. Their opinions lead us to conclude that more probably than not Dr. McFarland’s deviation from the standard of care in making too small an incision made the surgery more difficult, causing the gouge to slip, and that the gouge struck the nerve and damaged it. We also find that the physician compounded the problem by failing to refer his patient promptly to a neurologist or neurosurgeon; the plaintiff’s months of favoring the affected leg made a back problem symptomatic. Finally, we find that, although damage to the lateral femoral cutaneous nerve is a known complication of bone harvesting, it is exceedingly rare.
We have reviewed the appellant’s remaining assignments of error in the judge’s rulings at trial.
Deposition of Dr. McFarland. The appellant asserts his case was prejudiced by the court’s failure to admit the complete deposition into evidence. While the deposition of a party is admissible under La.C. C.P. art. 1450(A)(3), the plaintiff’s case was not prejudiced, as the conflicting prior testimony was brought out in his examination of Dr. McFarland at trial. As he did not proffer the deposition, the court’s ruling was not in error. Verrett v. Preston, 374 So.2d 121 (La.App. 1st Cir.1979).
Deposition of Dr. J. Ollie Ed-munds. Counsel for the defendants conducted a video deposition of Dr. Edmunds, a member of the review panel, and introduced it into evidence in lieu of his appearance at trial. The tape was played at trial, but when the plaintiff’s redirect was reached the defendants’ counsel moved to waive the remainder of the deposition. .Counsel for the plaintiff objected but the judge overruled. La.C.C.P. art. 1450(A)(4) provides:
(4) If only part of a deposition is offered in evidence by a party, an adverse party may require him to introduce any other part which, in fairness, should be considered with the part introduced, and any party may introduce any other parts.
The trial judge’s ruling in this matter was erroneous. Our review of the transcript, however, indicates that it contained no material that would have benefited the plaintiff; therefore, this was harmless error.
Testimony of members of Medical Review Panel. The appellant complains that his case was prejudiced by the defendants’ improper questioning of the three members of the review panel, Dr. Harold M. Stokes, Dr. Robert G. Chuinard, and Dr. J. Ollie Edmunds. Each member was asked to read the one-sentence opinion of the panel and the oath, to identify his signature and to state whether he followed the oath in reaching his decision. LSA-R.S. 40:1299.47(H) provides, in pertinent part:
.Any report of the expert opinion reached by the medical review panel shall be admissible as evidence in any action subsequently brought by the claimant in a court of law, but such expert opinion shall not be conclusive and either party shall have the right to call, at his cost, any member of the medical review panel as a witness. If called, the witness' shall be required to appear and testify....
While the defendants’ tactic no doubt overemphasized the report of the review panel to the jury, they were entitled to call and question the members.
Jury Charges. The appellant stated his objections to eight of the jury instructions. Number 11, to which he objected most stre-nously reads as follows:
The State of Louisiana requires in this case that a Medical Review Panel hear some of the same evidence which you *1236 have just listened to. A Medical Review Panel consists of three physicians, usually in the same specialty as the defendant/physician. The way it works is like this: The plaintiff chooses a physician and the defendant chooses a physician. These two physicians jointly choose another physician. The three panelists are required to take a solemn oath just as you, the jury, did that they will faithfully perform their duties without favoritism or partiality. Then, the Panel reads all of the medical records and, based on their own experience and knowledge in the area, renders its decision. In this instance, the Panel determined that Mr. McFarland had not violated the applicable standards of care. The decision of the Medical Review Panel is not conclusive.
This instruction was superfluous and overemphasized the importance of the finding of the medical review panel to the detriment of the plaintiff.

Directed Verdict for Ochsner Hospital and Clinic.

Other than a brief statement that under the doctrine of respondeat superior Dr. McFarland's alleged acts of negligence are imputed to Ochsner, counsel for the appellant does not brief this assignment of error. No evidence suggesting personnel of the hospital were negligent was presented at trial. Accordingly, we find this assignment of error is without merit.

Damages

The plaintiffs expert, Dr. George R. Rice, professor of economics at LSU testified as to Bourgeois’ lost past income and loss of future wages. He arrived at a figure of $491,214. No rebutting evidence was produced by the defense. There is a joint stipulation by the parties that Avon-dale has paid $58,027.43 in medical expenses and $34,047.84 in compensation.
The medical malpractice act sets a recovery limit of $500,000 for all claims as follows, in pertinent part:
R.S. 1299.42 B. (1) The total amount recoverable for all malpractice claims for injuries to or death of a patient, exclusive of future medical care and related benefits as provided in R.S. 40:1299.43, shall not exceed five hundred thousand dollars plus interest and cost.
R.S. 40:1299.43 A. (1) In all malpractice claims filed with the commissioner of insurance which proceed to trial, the jury shall be given a special interrogatory asking if the patient is in need of future medical care and related benefits and the amount thereof.
“Future medical care and related benefits” has been construed to mean all reasonable medical expenses incurred from the date of the alleged malpractice. LaMark v. NME Hospitals, Inc., 522 So.2d 634 (La.App. 4th Cir.1988), writ. denied, 526 So.2d 803 (La.1988).
As the jury found in favor of the defendant, we assume that it did not respond to an interrogatory regarding future medical care, as set out in R.S. 40:1299.43(A)(1). In Dr. Fleming’s testimony, he stated that Bourgeois was still under his care, wearing a back brace, and that it would be one and one-half to two years before Bourgeois could return to light duty. The wrist had been X-rayed recently and appeared to be healing well; we would assume Bourgeois must be examined periodically.
For the reasons assigned above, the case appealed from is affirmed insofar as it dismisses plaintiff’s claim against Ochsner Clinic and Ochsner Foundation Hospital; it is reversed and set aside insofar as it found that Dr. Gordon B. McFarland, Jr. did not deviate from the standard of care for orthopedic surgeons.
The appellate court is empowered to fix damages under its authority to review facts. Rodriguez v. Traylor, 481 So.2d 1017 (La.1986). Accordingly, we render judgment in favor of the plaintiff, Robert A. Brougeois, Sr. and against Dr. Gordon B. McFarland in the maximum amount of $500,000, subject to a limit of professional liability of $100,000,[4] and representing *1237 $491,214 in lost past and future wages, subject to reimbursement of $34,047.84 to Avondale, and the remainder of $8,786 for pain and suffering; we further award medical expenses,[5] beginning with the date of malpractice, May 17, 1983, until date of judgment, September 26, 1988, subject to reimbursement to Avondale, plus future medical expenses of $10,000; we further award interest on the judgment from date of judicial demand, all costs of these proceedings and those below, plus fees of expert witnesses who testified for plaintiff. We remand for the limited purpose of determining amounts due for medical expenses to the plaintiff and to Avondale.
AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.

. Dr. Fleming explained that some patients "reject their own bone graft,” and plaintiff alleges no malpractice on that part of the surgery.

. Avondale intervened in the suit, seeking reimbursement of its medical and worker's compensation payments.

. The defendants point out that the incision was described as four inches long in the operating report. Dr. Kline’s testimony clearly indicates the old scar was two inches when he performed the extirpation of the nerve; consequently, we conclude the operating report is in error on this detail.

. LSA 40:1299.42 provides, in pertinent part:
B.(2) A health care provider qualified under this Part is not liable for an amount in *1237 excess of one hundred thousand dollars for all malpractice claims because of injuries to or death of any one patient.
(3)(a) Any amount due from a judgment or settlement or from a final award in an arbitration proceeding which is in excess of the total liability of all health care providers, as provided in Paragraph (2) of this Subsection, shall be paid from the patient’s compensation fund pursuant to the provisions of R.S. 40:1299.44(C).

. Prince A. Williams v. Jack Kushner, et al., 549 So.2d 294 (La.1989); LaMark v. NME Hospitals, Inc., supra.