621 So.2d 54 (1993)
Mary Ann WARE, Plaintiff-Appellant,
v.
MEDICAL PROTECTIVE INSURANCE COMPANY, et al., Defendants-Appellees.
No. 24875-CA.
Court of Appeal of Louisiana, Second Circuit.
June 23, 1993.
*55 Nelson & Hammons by John L. Hammons, Shreveport, for plaintiff.
Blanchard, Walker, O'Quin & Roberts by Lawrence W. Pettiette, Jr., A.M. Stroud, III and Edwin H. Byrd, III, Shreveport, Juneau, Judice, Hill & Adley by Marc W. Judice, Lafayette, for defendants.
Before MARVIN, HIGHTOWER and BROWN, JJ.
HIGHTOWER, Judge.
In this wrongful death/dental malpractice action, a surviving wife appeals from a *56 judgment rejecting her demands against an endodontist and his insurer, pursuant to unanimous jury verdict. For the reasons that follow, we affirm.

BACKGROUND
After experiencing a toothache for two days, Billy Gene Ware, age 49, sought treatment from Dr. Perry Hollembeak, a general dentist, on November 18, 1987. X-rays showed a suspected abscess near the root of the upper left lateral incisor. After consulting the dentist who previously performed a root canal procedure on the same tooth in another city, Dr. Hollembeak made arrangements for Ware to see an endodontist, Dr. Paul Wood, and also prescribed Tylenol 3 (containing acetaminophen) for the pain.
Ware saw the endodontist on the morning of November 20, 1987, still complaining of severe pain in the area of the abovementioned tooth. Dr. Wood did not obtain a blood pressure reading, but the patient informed him, consistent with a previously completed questionnaire, of his medically controlled hypertensive condition. After discussing other treatment options, the dental specialist performed a retrofil procedure, the placement of a filling in the root tip in order to prevent future infection. During that process, the endodontist administered, at most, 85 micrograms of epinephrine, along with a local anesthetic.
Plaintiff accompanied her husband on the date in question. According to her, upon completion of the procedure, he appeared "shaky," "gray[ish]" in the face, and sweaty. Additionally, she recalled that he could not ambulate without assistance, and that she had to open the door as they exited the dentist's office. She further indicated that her spouse experienced chills both while in route home and later when he sought bedrest, and that his condition worsened during the afternoon.
Gay Hooper, the dental assistant who aided during the procedure, and two other employees of the office testified for the defense. Contrary to plaintiff's description of her husband, all three of these individuals remembered Ware being alert and able to walk unassisted immediately after the treatment. Hooper observed neither an ashen appearance nor any other adverse reaction to the medication administered during the procedure; one of the other two witnesses stated that the patient opened the door for his wife in departing the building. Nor, as Ware postoperatively traversed the hallway toward the front desk, did Dr. Wood detect any of the symptoms described by plaintiff.
Unfortunately, around 3:00 p.m., Ware suffered convulsions. Emergency paramedics, and later physicians at Riverside Community Hospital, attempted to save his life but, at about 5:00 p.m., he died.
An autopsy by the parish coroner, Dr. George McCormick, showed the cause of death to be "acute cardiorespiratory failure," most logically attributable to a history of hypertension. That document further stated, "It would be attractive to try to tie [the] dental surgery to his death, but the evidence for that was not present." Notwithstanding these declarations, approximately two and one-half years later, the physician supplemented the earlier certificate to then report that death had been "caused by an overdose of epinephrine, complicated by methemoglobinemia caused by an interaction between acetaminophen [Mr. Ware] was taking, and Prilocaine given to him during the dental procedure." During trial, in yet a third conclusion, the coroner would fully subscribe to his second report but also opine, for the first time, that a heart attack caused the death.
Plaintiff instituted suit, in the district court, against Dr. Paul Wood and his malpractice insurer on March 7, 1991. Following a seven-day trial, jurors responded negatively to the special verdict query, "Did the defendant, Dr. Paul L. Wood, provide substandard care as an endodontist in his treatment of Billy Gene Ware?" This appeal ensued, after the signing of judgment.

ADMISSIBILITY OF TESTIMONY
In the first presented issue, concerning the trial court's refusal to exclude the testimony of Dr. Henry Handley, plaintiff argues surprise and unfairness in that the *57 cardiologist had not been listed in responses to initial or supplemental interrogatories, or on the pretrial order. In brief, defendants assert that the unavailability of a previously-listed cardiologist, Dr. Herbert Master, prompted their request to substitute experts on the first day of trial.
The trial judge, of course, is granted broad discretion in conducting a trial and in determining whether to receive or refuse testimony. Curry v. Johnson, 590 So.2d 1213 (La.App. 1st Cir.1991). Likewise, in implementing a pretrial order pursuant to LSA-C.C.P. Art. 1551, the lower court has much discretion to allow modifications that prevent substantial injustice. Gilcrease v. Gilcrease, 438 So.2d 658 (La. App. 2d Cir.1983), writ denied, 442 So.2d 461 (La.1983); Zanca v. Exhibition Contractors Co., 614 So.2d 325 (La.App. 4th Cir.1993); Curry, supra; Reese v. Griffith, 568 So.2d 1146 (La.App. 5th Cir.1990).
True enough, Dr. Handley is not named as a potential witness in the abovementioned documents. However, as reflected by the record, defendants amended their witness list almost two months in advance of trial to include the cardiologist, Dr. Master. Later, the pretrial order also incorporated his name as a defense witness, that document actually having been filed by counsel for plaintiff.
Even so, plaintiff's counsel chose not to depose Dr. Master, though in subsequent appellate oral argument admitting an awareness of the listed cardiologist long before trial. Hence, such a deposition not having been secured, the trial court apparently concluded that prejudice would not likely result from the requested substitution of experts. We also note that more than a week elapsed from the beginning of trial until Dr. Handley actually testified, with a weekend recess intervening. Yet, as later acknowledged, counsel for plaintiff again made no effort to depose the expert, nor moved for a continuance.
Given this sequence of events, we fail to perceive any abuse of discretion in allowing the cardiologist to testify.

INSTRUCTIONS TO JURY
Next, in assailing the rejection of a proposed special jury charge, plaintiff basically contends the trial judge should have enunciated that a negligent local standard of care cannot shield a healthcare provider from liability. As authority for such an instruction, appellant cites Favalora v. Aetna Cas. & Surety Co., 144 So.2d 544 (La.App. 1st Cir.1962). In that case, after discussing the then-controlling locality rule (that a physician or dentist would be held to that degree of care observed by other practitioners in the defendant's locality), the court concluded that such a local standard would not avert liability if shown to constitute negligence.
However, by later enacting Act 807 of 1975, which became LSA-R.S. 9:2794, the legislature abrogated the locality rule with respect to medical and dental specialists, directing instead that their duty be gauged by that degree of care ordinarily practiced by others involved in the same specialty. Thus, as repeatedly observed, the locality rule is no longer applicable to claims against a specialist. Piazza v. Behrman Chiropractic Clinic, Inc., 601 So.2d 1378 (La.1992); Ardoin v. Hartford Acc. & Indem. Co., 360 So.2d 1331 (La. 1978); Ogletree v. Willis-Knighton Memorial Hosp., 530 So.2d 1175 (La.App. 2d Cir.1988), writ denied, 532 So.2d 133 (La. 1988); Douzart v. Jones, 528 So.2d 602 (La.App.2d Cir.1988); Parmelee v. Kline, 579 So.2d 1008 (La.App. 5th Cir.1991), writ denied, 586 So.2d 564 (La.1991); Bourgeois v. Ochsner Foundation Hosp., 550 So.2d 1229 (La.App. 5th Cir.1989), writs denied, 556 So.2d 1284, 1286 (La.1990).
With respect to malpractice actions against a dental specialist, LSA-R.S. 9:2794 A(1) now pertinently states:
where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by ... dentists ... within the involved medical specialty.
*58 Dr. Wood, a practicing endodontist, obviously classifies as a specialist, not a general practitioner. Consistent with that fact, the trial judge's charge made clear that the degree of care provided by defendant should be measured against that ordinarily practiced by other endodontists on a national basis, rather than "the standard of care and skill within [his] immediate community or locality." The court also correctly set forth that plaintiff had the burden of proving the extent of care ordinarily exercised within the specialty. See LSA-R.S. 9:2794 A(1). Accordingly, no error transpired in denying the requested special jury instruction.

LIABILITY OF DR. WOOD
The remainder of plaintiff's relevant arguments can be summarized in a single question: Was the jury clearly wrong in finding that Dr. Wood did not provide substandard care?

Burden of Proof and Standard of Review
In a malpractice action against an endodontist, the plaintiff must establish that the doctor's treatment fell below the ordinary standard of care expected of dentists in his specialty, and also that a causal relationship existed between the alleged negligent treatment and the injury sustained. LSA-R.S. 9:2794. See also Martin v. East Jefferson Gen. Hosp., 582 So.2d 1272 (La.1991); Smith v. State, through DHHR, 523 So.2d 815 (La.1988); Bolton v. LSU Med. Ctr., 601 So.2d 677 (La.App. 2d Cir.1992); Gibson v. Bossier City Gen. Hosp., 594 So.2d 1332 (La.App. 2d Cir. 1991); Iseah v. E.A. Conway Memorial Hosp., 591 So.2d 767 (La.App. 2d Cir.1991), writ denied, 595 So.2d 657 (La.1992). In reference to causation in the circumstance where the patient dies, the plaintiff need only prove that the defendant's malpractice resulted in the loss of a chance of survival, and is not faced with the unreasonable burden of demonstrating that the patient would have survived if properly treated. Martin, supra; Smith, supra; Hastings v. Baton Rouge Gen. Hosp., 498 So.2d 713 (La.1986); Arant v. St. Francis Med. Ctr., Inc., 605 So.2d 622 (La.App. 2d Cir.1992), writ denied, 608 So.2d 193 (La.1992); Bolton, supra.
Of course, it is well settled that an appellate court may not set aside findings of fact by a jury or trial judge in the absence of manifest error or clear wrongness. More to the point, where there is conflict in the testimony, reasonable evaluations of credibility and inferences of fact should not be disturbed on review. Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978); Canter v. Koehring, 283 So.2d 716 (La.1973). If reasonable in light of the entire record, then, a fact-trier's choice between two permissible views of the evidence cannot be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989).

Standard of Care
Plaintiff called Dr. Stanley Malamed, a dental anesthesiologist and respected academic, who testified that the standard of care in 1987 required minimally that all dentists determine a patient's blood pressure before performing any procedure, even including teeth cleanings. Interestingly, that opinion appears at odds with a 1986 article in Dental Impressions, wherein Dr. Malamed recognized that dentists did not routinely check blood pressure, although he had recommended such an approach. During testimony, he additionally concurred that where vasopressors (e.g., epinephrine) containing local anesthetics are considered for administration, a preoperative determination of blood pressure, heart rate and rhythm becomes mandatory. However, this witness found no problem with the amounts of medications given Ware, and deemed such low to normal doses "not of any relevance" with respect to any cause of methemoglobinemia.
Dr. Wood testified that in 1987 he did not routinely take blood pressure readings from his patients, but rather utilized his professional judgment to determine whether, under the particular circumstances, such data would be medically desirable. His preoperative conversation in the instant *59 matter revealed that, consistent with a medical history questionnaire completed minutes earlier, the patient's hypertensive condition had been medically controlled, and also that Ware occasionally monitored his own blood pressure with a commonly used cuff device. Dr. Wood additionally remembered that, prior to the retrofil procedure, he telephonically conferred with Dr. Hollembeak about the patient's history and current dental needs. Testimony by the treating dentist also corroborated that communication.
Ware's history included a blood pressure of 154/92, taken on August 4, 1987, by Dr. Hollembeak. Testimony by the patient's treating internists, Drs. Robert Ewing and William Giddens, revealed that through medication his blood pressure had been normal for several years and would have created no concern about his tolerance of dental procedures. Likewise, given that background of mild, stable hypertension controlled by therapy, Dr. Handley, chief cardiologist at the LSU Medical Center in Shreveport, stated with reasonable medical certainty that the patient's blood pressure continued to be under control on November 20, 1987. He also noted international studies showing that up to 200 micrograms of epinephrine produces little or no effect on blood pressure.
Each of three practicing endodontists, Drs. Edward Bailey, Owen Reader, Jr., and William Wayman, corroborated Dr. Wood's testimony that the practice of their specialty in 1987 did not routinely include obtaining a patient's blood pressure, particularly when the individual related his condition in that regard as regularly monitored and medically controlled. Dr. Reader, who taught endodontics at LSU in the early 1980's, emphatically denied that the standard of care, either in 1987 or at the time of trial, demanded such a course of action. Similarly, Drs. Bailey and Wayman testified that they would not have performed the retrofil procedure differently, given the circumstances of the present case.[1]
Accordingly, the record more than adequately supports the jury's determination that plaintiff failed to show that the standard of care for endodontists in 1987 required the taking of Ware's blood pressure, preoperatively or otherwise. Furthermore, the resolution of conflicting testimony and the assessment of credibility lies essentially within the province of the jury. Arceneaux, supra.

Methemoglobinemia and Epinephrine Overdose
As previously stated, Dr. George McCormick, an expert in anatomic and forensic pathology, concluded in his supplemental postmortem report that Ware's death resulted from an overdose of epinephrine, complicated by drug-induced methemoglobinemia. While the jury did not reach the issue of causation, we have nonetheless elected to examine the coroner's determinations in that regard, a topic extensively argued by appellant.
In finding an excessive dosage of epinephrine administered, Dr. McCormick stated the bases of his belief to be:
[t]he calculations of Mr. McGarity,[2] that it was an overdoes [sic] amount, and my own belief that regardless of how much *60 was given that the drug was there in an overdose amount. You've got to understand, Counsel, and I've got to explain this answer. Overdoses are not black and white situations. I may give you a drug that you can walk down the street with which would knock we [sic] dead. It may [be a] lethal dose for you and lethal dose for me and it may not effect you that way. So, it's my opinion that how much epinephrine was there in this particular patient it was an overdose.
Concerning methemoglobinemia (the excessive presence of methemoglobin in the blood, resulting in deficient oxygenation of body cells), the physician indicated his reasoning that Ware's blood contained methemoglobin originated not from scientific analysis, but from an emergency room physician's comment about the "chocolate" coloration of the fluid.
In defending his "overdose of epinephrine" theory, Dr. McCormick in great part contradicted Dr. Malamed, also called by plaintiff. Save for obtaining a blood pressure as discussed heretofore, Dr. Malamed would not have performed the retrofil procedure differently. More specifically, and as previously mentioned, he found the administered amounts of medications appropriate under the circumstances, and even noted the lack of cardiovascular side effects that vasopressor dosages produce for dental patients. Similarly, Dr. Handley, expert cardiologist, did not consider the patient's hypertension contraindicative for administering local anesthesia containing epinephrine. Nor did Drs. Bailey, Reader, or Wayman fault administration of 85 micrograms of this drug.
According to Dr. Michael Moore, an expert in hematology and oncology, simply observing the color of blood does not suffice to properly diagnose methemoglobinemia, a very rare disease or disorder. He stated that, while "chocolate" blood may pose a suspicion in that regard, it is likewise true that cardiac arrest causes a similar appearance. In addition, Dr. Bryan Finkle, research professor of pharmacology, toxicology, and pathology, after reviewing the supplemental autopsy report, termed its references to both drug-induced methemoglobinemia and an epinephrine overdose as "entirely speculation," lacking support from either medical or scientific testing.
Finally, according to Dr. Handley, the symptoms experienced by decedent, and the data collected postmortem, typified a classic case of Sudden Death Syndrome. Such an event, the cardiologist related, contributes to approximately 350,000 deaths yearly. Once set in motion by the electrical system of the heart "go[ing] awry," as he described, the organ simply stops beating, sending the victim into ventricular fibrillation.
Thus, numerous medical experts largely rebutted the plaintiff's hypothesis of causation by epinephrine overdose and drug-induced methemoglobinemia. Accordingly, upon considering that evidence, especially when combined with the conflicting testimony anent decedent's appearance immediately following the retrofil procedure, it is evident that the record provides additional support for the trial court judgment ultimately rendered.

CONCLUSION
After a thorough review and evaluation of the record, concluding that the trial court neither abused its discretion in admitting testimony by Dr. Handley, nor erred in denying plaintiff's requested jury charge, and further deeming the evidence adequately supportive of the jury verdict, we affirm. Costs are assessed against appellant.
AFFIRMED.
BROWN, J., concurs with written reasons.
BROWN, Judge, concurring.
I concur in the results but do not fully agree with the discussion. The widow of Billy Gene Ware sued Dr. Paul Wood for her husband's death alleging dental/medical malpractice. Ware was 49 years old with a history of high blood pressure. With the exception of the high blood pressure, Ware had no significant medical problems. *61 Ware's hypertension was treated with medication and not considered dangerous (i.e. subject to sudden death).
For at least three days Ware suffered severe pain and stress due to an abscessed tooth. Ware was referred to Dr. Wood, an endodontist, for treatment. Both Dr. Wood and the referring dentist, Dr. Hollenbeak, obtained a history of hypertension but did not take a current blood pressure reading. Dr. Wood completed a root canal at approximately 11:00 a.m. on November 20, 1987. At approximately 2:30 p.m., Ware's wife called an emergency medical unit which transported Ware to Riverside Hospital where he was dead on arrival. According to the coroner's final report, he died of a heart attack.
The jury's verdict was that Dr. Wood did not provide substandard care in his treatment of Billy Gene Ware. Thus, the jury did not reach other issues, such as causation.
Plaintiff argues that if Dr. Wood had taken the seconds necessary to perform a blood pressure test, he would have known whether or not Ware's blood pressure was elevated to the extent that the procedure (root canal) would have been hazardous. If the blood pressure was elevated, plaintiff argues that Dr. Wood could have contacted Ware's treating physician to determine the appropriate course of conduct or at least Dr. Wood would not have administered the vasoconstricting drug, epinephrine, which is used to hold the local anesthetic in place.
It is plaintiff's position that if Ware's blood pressure was exacerbated to more than 200/115 then the vasoconstricting drug administered by Dr. Wood would have contributed to his heart attack that afternoon. Dr. Malamed agreed but stated that if Ware's blood pressure was in a lesser range, Dr. Wood's drug choices were appropriate. The problem is that Dr. Wood did not take a blood pressure reading so we don't know what Ware's blood pressure actually was. In August 1987 Ware's treating physician noted a blood pressure reading of 160/86 which was much better than a reading six days earlier that was "substantially elevated." (Unfortunately, the doctor's record did not contain the exact reading). However, in November Ware was under stress because of his pain.
The jury found that Dr. Wood did not breach the national standard of care by not determining Ware's pre-operative blood pressure. The experts differed on what this national standard was for endodontists performing this type of procedure. At least one endodontist testifying for defendant now takes blood pressure readings for all patients as a screening procedure. Generally, all the experts agreed that the dosage of epinephrine used in this case presented little risk unless the patient had an "exacerbated" blood pressure reading.
Although it is a simple, inexpensive and quick procedure, the defense experts believed that the appropriate medical standard did not require the taking of blood pressure in this case. Because Ware said his hypertension was being treated and under control, these defense experts saw no reason for Dr. Wood to believe Ware's blood pressure was exacerbated. Under these circumstances, I cannot say that the jury was clearly wrong or manifestly erroneous in accepting the opinion of the defendant's experts.
NOTES
[1] Plaintiff, in brief, theorizes that the testimony of these witnesses exemplifies a "conspiracy of silence" among endodontists in Louisiana. Of course, the potential for such an evil has been addressed in Ogletree, supra. However, in the case at hand, beyond unfounded supposition, nothing supports plaintiff's speculations that the three endodontists would testify untruthfully. Furthermore, as noted in Ogletree, such an argument more appropriately concerns witness credibility, an issue to be resolved by the jury.
[2] Dr. McCormick's supplemental second report begins:

Since the date of completion of the original report in this case (December 21, 1987), additional information concerning the death of Billy Gene Ware has been brought to my attention. This information was contained in two reports written by Gary J. McGarity, R.Ph., M.P.A., dated June 13, 1989, and August 23, 1989, respectively. These reports were prepared for the decedent's widow ... at the request of her attorney.... [Emphasis added.]
Although listed as a potential witness by plaintiff, McGarity did not testify, and no other definitive reference to this individual, or his calculations, appears of record.