962 So.2d 493 (2007)
Lawson WILHITE, Sr., Individually and O/B/O Geraldine Wilhite, (Deceased); Lawson Wilhite, Jr.; Hazelwilhite Moore; Nellie Wilhite Brown; Savanna Wilhite Walker; Diane Wilhite Turner; Larry Wilhite; Mary Wilhite Moffett; and The Estate of Connie Wilhite and B.J.W. (Minor Child of Connie Wilhite), Plaintiffs-Appellants
v.
David THOMPSON, M.D.; Dan LeFleur, M.D.; Medical Protective Company; Kwabena Owasu, M.D., Emcare, Inc.; and Lexington Insurance, Defendants-Appellees.
No. 42,395-CA.
Court of Appeal of Louisiana, Second Circuit.
August 15, 2007.
*495 Susan E. Hamm, A.P.L.C., Stephen A. Jefferson, Monroe, for Appellants.
Noah, Smith & Johnson, L.L.P. by Elmer G. Noah, II, Monroe, for Appellees.
Before STEWART, PEATROSS & MOORE, JJ.
PEATROSS, J.
This appeal arises from the death of Geraldine Wilhite on January 30, 2001, due to severe infection. Her heirs including her husband, Lawson Wilhite, Sr., and her estate ("Plaintiffs") sued David Thompson, M.D. and Dan LeFleur, M.D. ("Defendants") claiming that their treatment of Mrs. Wilhite constituted medical malpractice. The jury found in favor of Defendants and, accordingly, the trial court dismissed the action. Plaintiffs appeal. For the reasons stated herein, we affirm.

FACTS
After working Sunday night on January 21, 2001, Mrs. Wilhite started complaining of pain in her left knee. On Tuesday, her family took her to the emergency room ("ER") at Richardson Medical Center ("RMC") where Jay Mashburn, M.D., an ER physician, saw her. Dr. Mashburn treated her knee with a steroid injection and instructed her to see her regular doctor the following day.
Since Dr. David Thompson was Mrs. Wilhite's regular doctor, she went to his clinic in the late afternoon on Wednesday, January 24, 2001. Mrs. Wilhite was a long-time patient and former employee of the clinic, and since Dr. Thompson was not *496 seeing patients that day, she was seen by his partner, Dr. LeFleur. The exact nature of Mrs. Wilhite's symptoms are disputed. Plaintiffs assert that she was diaphoretic (sweaty) and in so much pain she could not walk. Her left knee was swollen, red and hot and her right wrist was swollen and Plaintiffs contend she presented as a very sick person. Defendants assert that Mrs. Wilhite's joints were tender, warm and swollen, and that she presented symptoms of an episode of gout. They maintain that she did not look generally sick.
Dr. LeFleur aspirated the joints attempting to draw fluid from the joints, otherwise called a knee tap. He noted that the joints were dry. He then injected her knee and wrist with steroids. Dr. LeFleur then arranged for a home health nurse to draw a blood sample the next day and to continue follow-up care for 60 days. Partial results from the blood work were faxed to the clinic on Thursday, January 25, with the remainder faxed the next morning. Dr. LeFleur reviewed all the test results on Friday, January 26, and, according to him, the test results confirmed his suspicion of gouty arthritis. Plaintiffs argue, however, that the "left shift" in the white blood cell count and the levels of other indicators present in the blood work results revealed that Mrs. Wilhite was a very sick person and were consistent with her having an infection which Dr. LeFleur failed to treat.
The home nurses visited Mrs. Wilhite in her home Thursday, Friday and Saturday. At each visit, she lay in bed the entire time and was unable to walk. Her vital signs were normal and she was afebrile, without a fever. According to one of the nurses, Mrs. Wilhite did not appear to be in a life-threatening condition.
Saturday evening, January, 27, 2001, Mrs. Wilhite began to exhibit an altered mental status. An ambulance took her to RMC in Rayville where she was evaluated by Kwabena Owusu, M.D., the E.R. physician on duty. One of the RMC nurses called Dr. Thompson concerning Mrs. Wilhite, because he was the "on call" physician for that weekend. Mrs. Wilhite was admitted to RMC under the care of Dr. Thompson. Based on the information given to him by the hospital staff and nurses, Dr. Thompson suspected she was having a stroke and ordered a CT scan. He did not go to the hospital to see her, but, instead, went to his office to consult her medical chart. Shortly after 11:30 p.m., the radiologist advised Dr. Thompson that the CT scan was normal.
At the family's request, Mrs. Wilhite was transferred by ambulance to North Monroe Hospital where she could receive a higher level of acute care. The family also requested that she be transferred to the care of Dr. Richard Smith, an internal medicine specialist. Dr. Alyce Adams, on call for Dr. Smith, accepted Mrs. Wilhite as a patient at 12:40 a.m. Sunday morning. In addition, Mrs. Wilhite was seen by Dr. Jeanette Lopez, a neurologist. Dr. Lopez initiated a work-up for infection, known as a "septic work-up." As soon as the samples were collected, Dr. Lopez started Mrs. Wilhite on intravenous antibiotics to cover a spectrum of possible sources of the infection. She diagnosed Mrs. Wilhite with sepsis or bacteria in the blood, secondary to an infected knee joint capsule. The blood and knee cultures grew out of the same bacteria, streptococcus pneumonia.
Mrs. Wilhite arrested Sunday morning. She was placed on life support and transferred to the Intensive Care Unit ("ICU"). On Tuesday, January 30, 2001, the family decided to discontinue life support and she was pronounced dead shortly after life support was discontinued.
*497 Mrs. Wilhite's family and estate sued Dr. LeFleur and Dr. Thompson for medical malpractice. In particular, they fault Dr. LeFleur for not properly considering an infection as part of his differential diagnosis when Mrs. Wilhite visited him on Wednesday, January 24, 2001. They argue that given her presentation, as they allege it to be, and considering the results of the lab work that Dr. LeFleur received on Friday, failing to treat her for a potential infection fell below the standard of care for a family practice physician. Plaintiffs fault Dr. Thompson for not coming to the hospital when Mrs. Wilhite arrived at the hospital on Saturday. They maintain that by failing to do so, Dr. Thompson missed a critical opportunity to diagnose and treat the infection and, instead, proceeded under the false belief that Mrs. Wilhite was suffering from a stroke.
In the course of the litigation, Dr. LeFleur and Dr. Thompson were unable to produce Mrs. Wilhite's medical chart. According to Dr. Thompson, he brought the chart to his office manager and requested that she secure the file after he was aware of the filing of the malpractice complaint. At some point thereafter the file was lost or misplaced. Plaintiffs requested that the trial court apply the adverse presumption of spoliation to what the medical chart would have revealed. The trial court denied their request and instead advised the jury: "Where a party failed to produce evidence available to him and gives no reasonable explanation, the presumption is that the evidence would have been unfavorable to his cause." Even considering this charge, the jury unanimously concluded that both Dr. LeFleur and Dr. Thompson met the standard of care expected of them. As previously stated, the trial court dismissed the case pursuant to the jury verdict. The trial court denied Plaintiffs' Motion for Judgment Notwithstanding the Verdict and their motion for new trial. Plaintiffs appeal.

DISCUSSION
The manifest error standard applies to our review of medical malpractice cases. Jackson v. Tulane Medical Center Hosp. and Clinic, 05-1594 (La.10/17/06), 942 So.2d 509. Under the manifest error standard of review, a factual finding cannot be set aside unless the appellate court finds that it is manifestly erroneous or clearly wrong. Smith v. Louisiana Dept. of Corrections, 93-1305 (La.2/28/94), 633 So.2d 129; Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880 (La.1993); Rosell v. ESCO, 549 So.2d 840 (La.1989). In order to reverse a factfinder's determination, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the factfinder is clearly wrong or manifestly erroneous. Salvant v. State, 05-2126 (La.7/6/06), 935 So.2d 646; Stobart, supra. The appellate court must not re-weigh the evidence or substitute its own factual findings because it would have decided the case differently. Pinsonneault v. Merchants & Farmers Bank & Trust Co., 01-2217, (La.4/3/02), 816 So.2d 270.
Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Rosell, supra. Although the standard of review is high, it does not require this court to abdicate its responsibility to review the trial court's findings, nor does it require this court to affirm a jury's verdict that is manifestly erroneous. Gordon v. Willis Knighton Medical Center, 27,044 (La. App.2d Cir.6/21/95), 661 So.2d 991, writs denied, 95-2776 and 95-2783 (La.1/26/96), *498 666 So.2d 679. Where the fact finder's conclusions are based on determinations regarding credibility of the witnesses, the manifest error standard demands great deference to the trier of fact, because only the trier of fact can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Rosell, supra.

Spoliation
Plaintiffs argue that the trial court manifestly erred by not applying an adverse presumption to Mrs. Wilhite's missing medical chart. They argue that, under the adverse presumption, the trial court should have found that Mrs. Wilhite presented at the clinic to Dr. LeFleur as a very sick person and that this description would have been supported by her chart.
A presumption may arise in the theory of spoliation of evidence when it is an intentional destruction of evidence for the purpose of depriving the opposing parties of its use. Lewis v. Albertson's Inc., 41,234 (La.App.2d Cir.6/28/06), 935 So.2d 771, writ denied, 06-1943 (La.11/9/06), 941 So.2d 42; Holloway v. Midland Risk Insurance Co., 36,262 (La.App.2d Cir.10/30/02), 832 So.2d 1004, writ denied, 02-3247 (La.3/28/03), 840 So.2d 571. Generally, a litigant's failure to produce evidence that is available to him raises a presumption that the evidence would have been detrimental to his case. This adverse presumption, however, is not applicable when the failure to produce the evidence is adequately explained. Holloway, supra. Even when the presumption applies, it is not necessarily fatal, but is one factor to weigh in adjudicating the case. Salone v. Jefferson Parish Dept. of Water, 94-212 (La.App. 5th Cir.10/12/94), 645 So.2d 747.
This court has recognized a negligence theory for a spoliation claim, but with limitations. Lewis, supra; Carter v. Exide Corp., 27,358 (La.App.2d Cir.9/29/95), 661 So.2d 698. The duty to preserve evidence is enforceable if it arose from "a statute, a contract, a special relationship between the parties, or an affirmative agreement or undertaking to preserve the evidence." Lewis, supra; Carter, supra. In Louisiana, a physician must preserve the medical records of his patient for six years after the last date of treatment. La. R.S. 40:1299.96(A)(3).
We find that the trial court was not clearly wrong in refusing to apply the adverse presumption. Whether under an intentional or negligence theory of spoliation, the presumption does not apply if the failure to produce the record is adequately explained. Holloway, supra. To employ the presumption otherwise would be to treat the failure to produce evidence under the terms of strict liability, such that the mere failure to produce evidence, regardless of the reason, would trigger the adverse presumption. This is not the standard. See, e.g., Lawrence v. City of Shreveport, 41,825 (La.App.2d Cir.1/31/07), 948 So.2d 1179, writ denied, 07-0441 (La.4/20/07), 954 So.2d 166; Gladney v. Milam, 39,982 (La.App.2d Cir.9/21/05), 911 So.2d 366.
Dr. Thompson testified that he last saw the chart when he handed it to his office manager after receiving notice of the malpractice claim. He instructed her to secure the chart. Both Defendants testified that, in 2001, their clinic had thousands of records. Dr. Thompson also testified that he instructed his staff to search the office for the missing chart without success.
If believed, this testimony depicts the good faith efforts made by Defendants to make the chart available to Plaintiffs during this litigation. The trial court instructed the jury that, if the failure to produce *499 evidence was not reasonably explained, they were to apply a presumption that the evidence would be unfavorable. From its verdict, the jury indicated that it believed Dr. Thompson's testimony and found his explanation to be reasonable. We cannot say such findings were manifestly erroneous. While we view any failure to produce evidence with great suspicion, we find that, on this record, the failure to produce the chart was adequately explained and, therefore, the presumption does not apply.
In addition, the factfinder is not required to abide by the adverse presumption to the exclusion of other evidence. Dr. LeFleur testified that Mrs. Wilhite presented with swelling, warmth and redness in her knee and wrist, but without fever and she did not otherwise present as a generally sick person. This description, which Plaintiffs dispute, is corroborated by the home healthcare nurses. Tonya KcInney Nielsen, R.N., testified that, when she visited Mrs. Wilhite on Thursday morning, her vital signs were normal and that nothing in Mrs. Wilhite's symptoms caught her particular attention. She described Mrs. Wilhite as being in fair condition.
Sherry Peevy McMurray, L.P.N., testified that, when she visited Mrs. Wilhite as a home nurse on Saturday morning, her vital signs were normal although her heart rate was a little high and her respirations were also high, but neither was concerning to her. Ms. McMurray further testified that she was extremely surprised when she later learned of Mrs. Wilhite's death and, at first, assumed it was not related to any medical condition.
The jury and the trial court are entitled to consider the entire testimony and evidence presented at trial. The corroborating evidence supports Dr. LeFluer's description of Mrs. Wilhite. This assignment of error is, therefore, without merit.

Expert Testimony
Plaintiffs next maintain that the trial court improperly limited their expert in infectious disease, Irving Posalski, M.D., to Mrs. Wilhite's chances of survival. In particular, they argue that Dr. Posalski should have been allowed to testify to Mrs. Wilhite's chances of survival if she had been given antibiotics at certain points in time. By agreement of Plaintiffs' counsel, Dr. Posalski was restricted to testifying on the issue of causation and was instructed not to comment on standard of care for a family practice physician.
We disagree that Dr. Posalski was restricted from testifying as to the chances of survival if antibiotics had been given. On redirect, he was asked without objection:
Q. Dr. Posalski, if Geraldine Wilhite had been treated with antibiotics on the Wednesday, the days after that, would she have survived?
A. I believe she would have survived.
This question clearly covers limitation on testimony of which Plaintiffs now complain. We find that this assignment of error is, therefore, without merit.

Use of Model Knee
During his testimony, Dr. LeFleur was allowed to use a model of a knee to explain how he performed the knee tap on Mrs. Wilhite. Plaintiffs dispute whether Dr. LeFleur properly performed the knee tap. Plaintiffs argue that the trial court erred in allowing Dr. LeFleur to use the knee model because Defendants had not identified it prior to trial. They argue that to allow its use late in the trial after their experts had testified and had left town is reversible error. They further contend that they should be able to rely on pretrial discovery to determine what evidence would be used at trial.
*500 The lower court is given broad discretion to determine whether or not to modify a pretrial order. Vernon v. Wade Correctional Institute, 26,053 (La.App.2d Cir.8/19/94), 642 So.2d 684; Ware v. Medical Protective Insurance Co., 621 So.2d 54 (La.App. 2d Cir.1993), writ denied, 629 So.2d 354 (La.1993); Tassin v. Cigna Insurance Co., 583 So.2d 1222 (La.App. 3d Cir.1991). This discretion is controlled by the principle that it must be exercised to prevent substantial injustice to the parties who have relied on the pretrial rulings or agreements and structured the preparation and presentation of their cases accordingly. Ware, supra; Wells v. Gillette, 620 So.2d 301 (La.App. 4th Cir.1993), writ denied, 629 So.2d 396 (La.1993); Naylor v. Louisiana Department of Public Highways, 423 So.2d 674 (La.App. 1st Cir.1982), writs denied, 427 So.2d 439 (La.1983), 429 So.2d 127 (La.1983), and 429 So.2d 134 (La.1983). Absent an abuse of discretion, the decision of the trier of fact will be upheld. Ware, supra.
The trial court allowed the model knee to be used because it would be helpful to the jury to understand the working of the knee and how the needle was placed into the knee when Dr. LeFleur performed the knee tap. Plaintiffs' counsel responded that, had he known that Defendants were going to use this demonstration, he would have had his expert do the same kind of demonstration. The failure of the Plaintiffs to demonstrate the testimony of their experts to the jury does not prevent the trial court from allowing Defendants from doing so. Such a modification to the pretrial order is within the trial court's discretion. Allowing Defendants to use the model knee allowed the jury to have a better understanding of the one procedure critical to the case. Plaintiffs were allowed to vigorously cross Dr. LeFleur using the model knee and did not suffer any substantial injustice. This assignment of error is, therefore, without merit.

Dismissal, Motion for JNOV, Motion for New Trial
As their final three assignments of error, Plaintiffs challenge the trial court's dismissal of the action pursuant to the jury verdict, its denial of Plaintiffs' motion for JNOV and its denial of their motion for new trial. Plaintiffs base their arguments in all three of these assignment of error on the adverse presumption to which they assert they are entitled based on the missing chart. As discussed above, the adverse presumption does not apply in this case. As also discussed above, the totality of the evidence supports the jury's verdict. Both sides presented several experts, including Dr. Thompson and Dr. LeFleur. The jury chose to accept Defendants' view of the evidence; and based on our review of the entire record, we cannot say that it manifestly erred in doing so. We find, therefore, that these assignments of error are without merit.

CONCLUSION
For the reasons stated above, the judgment of the trial court is affirmed. Costs of appeal are assessed to Plaintiffs.
AFFIRMED.
APPLICATION FOR REHEARING
Before WILLIAMS, STEWART, CARAWAY, PEATROSS and MOORE, JJ.
Rehearing denied.