416 So.2d 194 (1982)
MARYLAND CASUALTY COMPANY & SOUTHERN EQUIPMENT, INC.
v.
WATSON MARINE REPAIR & CLEANING SERVICE, INC.
No. 14761.
Court of Appeal of Louisiana, First Circuit.
May 25, 1982.
Rehearing Denied July 13, 1982.
*195 John W. Perry, Jr., Baton Rouge, for plaintiff-appellee Maryland Cas. Co. & Southern Equipment, Inc.
E. Wade Shows, Baton Rouge, for defendant-appellant Watson Marine Repair & Cleaning Service, Inc.
Before ELLIS, PONDER and SAVOIE, JJ.
SAVOIE, Judge.
FACTS IN GENERAL:
On November 28, 1978, a large air compressor was leased by Watson Marine from Southern Equipment. Due to mechanical problems, the compressor was several times removed by the lessor and replaced with another. On May 15th, 1979, a mechanic sent by Southern Equipment to try to remedy the latest problem, reported to his superior that the machine was leaking and could not be safely used. This man, Mr. Robert Bruns, Vice-President and General Manager of Southern, immediately called Mr. Gerald Schilling, General Superintendent of Watson Marine:
"I called out there to talk to Captain Watson, Billy, and he was out on the river. So I asked to talk to whoever was in charge, and it was Schilling. So we got on the phone and we was talking, and I said, look, the mechanic just informed me of a problem we have out there with the compressor, and it's a pretty dangerous situation. I said, we need to shut that piece of equipment down and get it swapped out immediately. He said, well, we can't do that. The river is up. The work barge, we can't get it close enough to the levee. I said, well, under that circumstance, I said, we are going to have to shut that unit down and take full responsibility because we have to swap it out. It can't continue to run like that. He said, I'll do that. I'll call you when I can swap it out, get the barge to the levee." (Tr. page 145) (Emphasis Ours)
On June 13, 1979, while still on the Watson barge, the compressor caught fire and was destroyed. Watson employees all affirm *196 that the machine had not been used since Mr. Bruns' call and that it was not in use when it caught fire. Evidence showed that Watson had run pipes ashore to make use of a shorebased compressor of its own. Investigation failed to reveal anything about the cause of the fire.
A written lease agreement produced by Southern provides that the lease is only terminated by the return of the equipment to Southern and that the risk of loss of the equipment rests with the lessee during the term of the lease.
Watson Marine denied that any authorized person ever signed the lease form in question and refused to pay. Thereupon, Southern recovered its loss (minus a $5,000.00 deductible amount) from its insurer, Maryland Casualty. Southern then sued Watson for the deductible and Maryland Casualty sued on its subrogation. Watson reconvened against Southern for damage caused to certain hoses on its barge by the fire in the compressor.
The District Court enforced the written lease according to its terms, giving judgment in favor of Southern for $6,912.00 and in favor of Maryland Casualty for $14,519.00, and dismissing Watson's reconventional demand. From that judgment, Watson has taken this appeal.
FACTS SURROUNDING CONFECTION OF THE LEASE:
On November 28, 1978, a need arose at Watson Marine for the use of an air compressor. Mr. Gerald Schilling, who did not himself have authority to enter into contracts for the corporation, telephoned Mr. Douglas Mayeaux, Vice-President and part-owner of Watson Marine, to inform him of the need and get permission to lease the needed machine. Obtaining this, he looked in the yellow pages for an equipment rental business (Tr. 105); called Southern and spoke with Mr. Ken Sides, inside salesman at Southern Equipment. He testified that he ordered a compressor of the needed type to be delivered and gave the address of Watson, but did not discuss the terms of the leasenot even bothering to ask the monthly rent. Ken Sides confirms Schilling's account of their conversation, though adding that he knew Mr. Schilling because Schilling had rented equipment from him once before. Sides, immediately after his conversation with Schilling, prepared a standard form lease agreement used by Southern Equipment and gave it to the truck driver with instructions to deliver the leased equipment and have the form signed. The truck driver was unable to testify at the trial because he had had a stroke.
Q. Did you tell the truck driver to contact Gerry [Gerald Schilling] when he got to the site?
A. No, sir. I didn't.
Q. Did you tell him to have the rental agreement executed by someone in authority at Watson Marine?
A. No, sir. I didn't.
Q. The normal procedure is to just have anybody sign it who accepts delivery of the equipment?
A. Right, yes, sir.
Q. Whether it's a laborer or the president of the company?
A. True.
(Tr. 134-5)
The compressor was received at the Watson site by Larry Mayeaux, the yard mechanic (son of Douglas Mayeaux) who testified that he signed the rental agreement, believing it to be a mere drayage receipt, and then (probably) gave the form to Gerald Schilling, who (again probably) passed it on to the accounting department.
Monthly rent charges were paid without comment by Watson Marine until the time of the fire.
LEGAL ISSUES ON APPEAL:
A. Whether the written lease ever entered into force.
B. Whether it remained in force at the time of the fire, after the conversation of May 15, 1979, wherein Southern assumed full responsibility.
C. The reconventional demand of Watson.
A. THE SIGNING OF THE LEASE; ITS SUBSEQUENT RATIFICATION.
In Southern States Equipment v. Jack Legett Co., 379 So.2d 881 (La.App. 4th *197 Cir. 1980), where the plaintiff sued to enforce this same form of lease and was met with the same defensethat the form was signed by a construction foreman not authorized to bind his companythe Court of Appeal said that by paying invoices submitted by the lessor, the lessee ratified the act of its foreman in signing the lease. In that case, the foreman, Bridges, had signed identical leases with Southern on behalf of his company on thirty-one previous occasions. In our case, there was evidence of only one instance of prior dealings between the parties. Further, even though the form lease,[1] by its terms, obligated the lessee to maintain the equipment, return it in the same condition in which it was received, and to continue to pay rent even if the equipment did not function, the parties never actually observed these terms. Instead, whenever trouble arose with the equipment, the lessee promptly complained to the lessor, who, just as promptly, sent someone to repair or replace it. Of course, this may just show forbearance on the part of the lessor, but we think, in this instance, it is evidence that the parties never intended, as a practical matter, to be bound by the terms set out in the form lease. A resolution of this question, however, is not necessary to our decision. Assuming that the terms of the form lease never came into force, use of the equipment and regular payment of rent, coupled with the evidence of the phone conversations between the principals, is certainly enough to show existence of a simple contract of lease, the terms of which are governed by Title IX of the Civil Code. Article 2697 lays the risk of loss of the thing leased during the term of the lease, where there is no showing of fault of the lessee, on the lessor. This would effectively dispose of the plaintiff's claim.
B. WAS THE LEASE IN FORCE AT THE TIME OF THE FIRE?
On the alternative theory, that the form lease was consented to by the parties and came into force, the result we reach is no different, since we find it to have been conclusively proven that the lease was cancelled by mutual consent of the parties prior to the fire. This conclusion is based on the conversation between Mr. Bruns and Mr. Schilling in May, 1979, the testimony concerning which has been quoted earlier.
There is no obstacle in law to the subsequent oral modification of a written instrument. Tholl Oil Co. v. Miller, 197 La. 976, 3 So.2d 97 (1941); Salley v. Louviere, 183 La. 92, 162 So. 811 (1935); Comment, Louisiana's Parol Evidence Rule: Civil Code Article 2276, 35 La.L.R. 779, 790 (1975). When Mr. Bruns told Mr. Schilling that the rented machine was dangerous to operate, he also told him, to use his own words given under oath in the trial court, "... we are going to have to shut that unit down and take full responsibility". What can the taking of full responsibility by the lessor mean except that the obligations of the lessee under the lease are cancelled? Mr. Bruns was then telling Mr. Schilling that, since his (the lessor's) machine had broken down and since through the fault of neither party, it could not then be exchanged, Watson (the lessee) would not have to pay further rent on it or bear any other obligations under the lease so long as he discontinued using it, took reasonable care of it, and notified the lessor when the river receded sufficiently that it could be removed. When the machine was subsequently destroyed through no provable fault of the lessee, the loss fell upon its owner.
The judgment of the trial court in favor of Southern Equipment Co. and Maryland Casualty Co. is reversed.
C. WATSON'S RECONVENTIONAL DEMAND
Watson claims $9,021.21 lost property and $4,530.00 lost profits caused by the fire in Southern's compressor and the consequent brief interruption of Watson's operations. They bring their claim under Civil *198 Code Article 2960 which imposes on a depositor the obligation to reimburse the depositary "for the losses which the thing deposited may have occasioned him". As noted in Watson's brief, Michael Rubin, writing in 35 La.L.Rev. 839 cites Coker v. Continental Ins. Companies, 265 So.2d 327 (La.App. 3rd Cir. 1972) and Fredieu v. City of Winnfield, 180 So.2d 48 (La.App. 2d Cir. 1965) for the proposition that depositors will not be held liable under this article unless they knew or should have known of the dangerous nature of the deposited article and failed to warn the depositary. These cases correctly state the law. Here the depositor did warn the depositary of the danger of operating the compressor. There is no evidence whatsoever that the depositor knew or should have known that the compressor was dangerous sitting unused. As said before, no party was able to discover anything about the cause of the fire.
We believe the reconventional demand was properly dismissed by the trial judge.
Judgment of the trial court in favor of Southern for the sum of $6,912.00 and in favor of Maryland Casualty for the sum of $14,519.00 is hereby reversed. Judgment dismissing the reconventional demand of Watson is affirmed, costs to be shared equally by the parties litigant.
REVERSED IN PART, AFFIRMED IN PART.
NOTES
[1] The terms of the form lease being printed in very fine print on the back of what, at first glance, appeared to be a delivery ticket.