661 So.2d 698 (1995)
Peggy CARTER, et al., Plaintiffs-Appellants,
v.
EXIDE CORPORATION, et al., Defendants-Appellees.
No. 27358-CA.
Court of Appeal of Louisiana, Second Circuit.
September 29, 1995.
*699 Graves, Graves & Hanna by Robert M. Hanna, Shreveport, for Appellants.
Bordelon, Hamlin & Theriot by William J. Hamlin and William C. Ellison, New Orleans, for Appellees, Bridgestone/Firestone.
Rountree, Cox, Guin & Achee by Billy J. Guin, Jr., Shreveport, for Appellees, Allstate Insurance Co. and Seborn Samuels.
Before MARVIN, SEXTON and BROWN, JJ.
MARVIN, Chief Judge.
In this auto mechanic's action in negligence (CC Art. 2315) and in strict liability (CC Art. 2317) against
(1) his employer, a Firestone Service Center in Shreveport,
(2) that employer's customer, Samuels, whose 1976 Ford pickup was being serviced in 1990 for battery and electrical problems, and
(3) Exide Corporation, the manufacturer of the battery sold to and installed in Samuels' pickup by Firestone about two months before, which exploded while being tested by the mechanic and caused him injury,
the mechanic, Carter, appeals the trial court's dismissal of the action against Samuels by granting his motion for summary judgment and against Firestone by sustaining its exception of no cause of action based on its worker's compensation statutory immunity in tort under LRS 23:1032.
The summary judgment was rendered before Celestine v. Union Oil Co., 94-1868 (La. 4/10/95), 652 So.2d 1299, which squarely held that an owner of a defective thing that poses an unreasonable risk of harm to a repairman of the thing may be strictly liable under some circumstances to the repairman for injury caused by the defective thing. The inquiry *700 into whether a risk is unreasonable is "context specific" or "fact intensive," Entrevia v. Hood, 427 So.2d 1146 (La.1983). See Celestine, supra, No. 94-1868, at pp. 2, 7-9; 652 So.2d at 1300, 1303-04. Moreover, Carter has effectively asserted that Samuels was actively participating in the test of the battery and negligently contributed to the cause of the explosion.
The judgment in favor of Firestone on the exception of no cause of action was based on the immunity in tort statutorily given employers for a work-related injury sustained by an employee. Here, however, the record suggests that after the battery exploded, one or more of Carter's superior employees at Firestone told or promised him that the remains of the battery would be preserved for his inspection and that Firestone failed to preserve the battery remains. The asserted negligence of the employer is not founded on any conduct that caused Carter's work-related injury from the explosion, but on the employer's breach of the post-explosion "promise" to preserve the remains of the battery.
On this record, we conclude that Carter's factual allegations against his employer may be amended to state a cause of action against Firestone. CCP Art. 934. We also conclude that Carter's factual allegations against Samuels are sufficient to state a cause of action under the CC Art. 2317 strict liability and to allow evidence of Samuels' alleged negligence because of his asserted participation in the testing of the battery.
Discussing these issues and more specifically stating the peculiar facts apparent at this juncture from the affidavits and depositions offered on the motion for summary judgment, we amend to reverse in part and remand on all issues except the sustaining of the no cause of action exception upholding the employer's statutory immunity in tort for the work-related injury to Carter caused by the explosion. We allow Carter to amend his petition to more fully allege his tort claim against Firestone arising from its asserted post-explosion promise to preserve the remains of the battery for him. We reverse the summary judgment and allow Carter to proceed against Samuels under CC Arts. 2315 and 2317.

FACTS
Samuels' affidavit and deposition, and the depositions of Carter and of Firestone's assistant store manager, Simmons, hereafter summarized, support our above stated conclusions.
Samuels bought a used 1976 Ford pickup from a third person in the mid-1980's. In the summer of 1989, after being unable to "crank" or start the truck's engine, Samuels bought a new battery from the Firestone service center on Fairfield Avenue in Shreveport. This battery apparently carried a 50-month, or four year, warranty. Carter was not employed at the service center in 1989.
About a year later, in early August 1990, Samuels again experienced problems starting the engine. He brought the truck back to the Firestone store, where the one-year-old battery was replaced with another new Exide 50-month battery, again by a Firestone employee other than Carter.
About two months later, Samuels again began having trouble starting the truck's engine. He checked the water level in the battery by removing the plastic caps or plates on the top of the battery. After noting that the water level was "low but not too low," Samuels brought the truck back to the Firestone store. Samuels said he told "the service department" that the truck "was hesitating to crank" and that "water was boiling out of the battery and ... the water in the battery was low." An unidentified employee at the front desk prepared a service ticket directing a "battery and electrical check" on the truck.
Carter, an experienced mechanic, ran a "battery load" test on the truck's electrical system by use of a diagnostic machine that measures the respective electrical charge of the battery, the "draw" of the starter, and the output of the alternator. Carter said he repeated the test about a dozen times, suspecting that the battery might have an "internal short," a problem that shows up only rarely, or not at all, during the diagnostic test. Each time the system was tested, all *701 readings were within normal limits except for the alternator output, which was about one volt higher than the maximum recommended level.
Carter wrote on Samuels' service ticket, "overcharging, 1.2 volts, boiling water out of battery." Samuels agreed to Carter's recommendation that the truck's voltage regulator be replaced. Samuels waited at the Firestone center while the regulator was replaced by an employee other than Carter.
After the voltage regulator was replaced, Carter again ran the diagnostic test on the truck's electrical system. All readings were within normal limits. Carter then removed one of the two caps or plates from the top of the battery without incident, and saw that the water level on that side of the battery was adequate. The explosion occurred as Carter tried to remove the second cap or plate from the battery to check the water level on the other side.
Samuels, who said he was standing a few feet off to the side of the truck when the explosion occurred, testified that the truck's engine was running while Carter was checking the water level in the battery. Samuels said he turned the engine off after the explosion.
According to Carter, the engine must be running to make the diagnostic test of the electrical system but should not be running during the water level check because "you could have sulphuric gas in there and a spark can cause one [the battery] to go [explode]." Our brackets. Carter said he told someone sitting in or standing near the truck, whom he believed to be Samuels, to turn "the vehicle" or "the ignition" off before he took any steps to check the battery water level. Carter said he was "sure" the engine had stopped running before he began the water level check.
Carter testified that a co-worker, Lee Johnson, who witnessed the explosion, later told him that the key to the truck was found turned to an intermediate "on" or "accessory" position immediately after the accident. Carter admitted he did not look at the key position inside the vehicle while he was working on it, but said he was sure the engine was not running when he began checking the battery water level. The conflict in the testimony in this area should be resolved at a trial on the merits.
The assistant store manager, Simmons, had "some background as a mechanic years ago," but was not tendered or deposed as an expert witness. Simmons testified that when a voltage regulator "goes bad," it may overcharge and "burn up" the battery, or "cook it inside."
Q. When that happens is the battery more likely to explode?
A. There's a possibility.
Q. And anybody working on batteries and voltage regulators would know that, wouldn't they?
A. Yes.
Q. Okay. So you would want to be somewhat careful when you are working on a battery like that.
A. Definite[ly]....
Q. After the voltage regulator is replaced, how long will it take for the battery not to be at a risk of explosion?
A. I couldn't answer that question.
Q. Does it remain that way permanently, or will it eventually go back to normal?
A. On an overcharged battery we have had them overcharge, and didn't have to replace them[.]
Q. Okay. Does it vary per battery?
A. It varies.
Carter admittedly knew that the voltage regulator in Samuels' truck was overcharging the battery by one volt, which Carter said was "nothing to speak of." Carter also knew that an overcharged battery will lose water through evaporation, and that it is "possibly" more likely to explode than a normally charged battery,
because you build up sulphuric gas ... [which has] a rotten egg sulphur smell when you have got it.... This [battery] didn't have [any] ... smell ... that day.
In more than 20 years of working as a mechanic, Carter had seen only two batteries explode: one that was "hooked up in a 24-volt series" and one that was being charged with the jumper cables attached incorrectly *702 to the battery posts. He knew, before the accident, that these things can cause a battery to explode:
A spark like if you are hooking up cables [to charge] one, you let it spark or if you are jumping and hooking up jumper cables and there is a problem with the battery, it can cause it to do it, or the battery has got an internal short.
Carter initially declined to state his opinion as to what caused the explosion that injured him, saying it would be "speculation." He later testified that he had discussed the accident with "a bunch of different mechanics" whose names he could not recall, saying that they told him a battery with an internal short may explode if the battery is touched while the vehicle's "ignition ... or something else is left on," because this effectively closes the electrical circuit and may cause a spark inside the battery. When his deposition was taken about two years after the accident, Carter said he had not retained, and had no plans to retain, an expert witness.
Simmons, the assistant store manager, testified that Carter should have checked the water level in the battery by looking through the side of the battery, rather than by prying off the caps or plates on top, because the battery was designed to be "maintenance-free." According to Simmons, the battery manufacturer recommends, and the mechanics know, that the caps of "maintenance-free" batteries should not be pried off, either to check or to alter the water level. Simmons said that when the markers on the side of the battery show that the water level has dropped below the acceptable limit, the battery is simply replaced.
Carter was not questioned on these matters in his deposition
Samuels testified that he disclosed to Firestone everything he knew about the problems he was having with his truck when he left it for repairs. Samuels categorically denied that he knew of "any dangerous propensities of the battery, the voltage regulator or the truck itself."
The facts we have summarized appear in documents filed by Samuels to support summary judgment. Carter filed a memorandum opposing summary judgment but did not file additional affidavits or depositions.

CLAIM AGAINST TRUCK OWNER
In his petition, Carter alleged that Samuels was negligent for failing to properly maintain the battery, for failing to warn Carter of the battery's explosive propensities, and for "any and all other negligent acts or omissions proven at trial." On the face of the petition, the allegations of negligence against Samuels are based solely on the fact of his ownership of the truck. We note, however, that Carter's deposition, which was offered in support of Samuels' motion for summary judgment, contains factual assertions which might arguably give rise to a claim that Samuels negligently contributed to the explosion by actively participating in the testing of the battery after the voltage regulator was replaced.
It appears from this record that the litigants and the trial court addressed the issue of Samuels' liability as owner of the truck by focusing solely upon what Samuels knew or should have known about the condition of the battery in his truck when he drove it to Firestone for repairs. The owner's knowledge in this respect is pivotal when liability is solely premised either on general negligence principles (CC Art. 2315) or on the law of deposit (CC Arts. 2926-2963). See, for example, Fredieu v. City of Winnfield, 180 So.2d 48 (La.App. 2d Cir.1965), writ denied; Estill v. Hanover Insurance Co., 209 So.2d 542 (La.App. 2d Cir.1968); Maryland Cas. Co. v. Watson Marine, 416 So.2d 194 (La. App. 1st Cir.1982), writ denied; and Hanchey v. State Farm Mut. Auto. Ins. Co., 570 So.2d 2 (La.App. 3d Cir.1990), writ denied.
Carter did not limit his allegations against Samuels to a negligence claim, however, having expressly alleged in his petition that Samuels was strictly liable under CC Art. 2317 "for the damages caused by the defective battery which was in [Samuels'] care, custody and control [immediately prior to his leaving the truck for repairs] and which [battery] constitutes a thing which presents an unreasonable risk of harm to other persons." Our brackets.
*703 Recovery under Art. 2317 requires proof that the plaintiff was injured by a thing which was in the care or custody of the defendant and which is deemed defective because it creates an unreasonable risk of harm to others. Loescher v. Parr, 324 So.2d 441 (La.1975). Recovery under negligence principles essentially requires proof of these same elements, plus proof of the additional element that the owner of the property knew or should have known it was defective. Kent v. Gulf States Utilities Co., 418 So.2d 493 (La.1982); Waters v. McDaniel Recreation Center, 521 So.2d 788 (La.App.2d Cir.1988), writ denied. When recovery is premised on the Art. 2317 strict liability, the owner's knowledge of the condition of his property is presumed, and need not be proved by the plaintiff. Kent; Waters; cited supra. See also Shaw v. Fidelity & Cas. Ins. Co., 582 So.2d 919 (La.App. 2d Cir.1991).
Samuels essentially argued in the trial court that even if Carter were able to prove that the battery in Samuels' truck contained a defect which caused Carter's injury, Samuels could not be held liable, as a matter of law, unless he knew or should have known of the defect and failed to warn Firestone of it when he left his truck for repairs. While this contention may have arguable merit with respect to Carter's negligence claim, it is not dispositive of that claim or the strict liability claim.
The documents offered to support summary judgment contain statements and inferences by lay witnesses about how, when and why the explosion occurred. See factual summary, supra. The documents cannot, however, be reasonably construed to resolve all material facts pertaining to the condition of the battery (defective or not?) and the cause of the explosion (defect in battery, manner in which Carter was performing his work, Samuels' "participation," or some combination thereof?). Compare Sanders v. Posi-Seal International, 93-1007 (La.App. 1st Cir. 4/8/94), 635 So.2d 760. There, the documents filed in support of the property owner's motion for summary judgment were found sufficient to warrant dismissal of the injured repairman's personal injury claim against the owner.
After the trial court granted summary judgment for Samuels, the supreme court considered whether and to what extent the owner of a building may be held strictly liable under CC Arts. 2317 and 2322 for injuries suffered by a repairman hired to perform maintenance and repair work on the building. Celestine v. Union Oil Co., cited supra. We emphasize parts of that opinion:
[W]e hold that an owner is strictly liable to a repairman for injury caused by a vice, defect or ruin on his premises only where the defect therein poses an unreasonable risk of harm vis-a-vis the repairman. Louisiana does not recognize a blanket "repairman" exception to strict liability under [CC Arts.] 2317 and 2322. However, given that the determination of whether a risk is "unreasonable" is context specific, the fact that the injured party was a repairman hired to fix the defect is a relevant factor in assessing whether the defect posed an unreasonable risk of harm....
[A]ny per se rule that an owner may never be held strictly liable to a repairman injured while repairing the alleged defect is unworkable and contrary to the fact intensive nature of the definition of "unreasonable risk." Rather, the individual circumstances, including but not limited to the social, moral, economic considerations, the degree of knowledge of the repairman, the incentive or disincentive to the owner to repair the vice or defect, the reasonableness of presuming that a particular repairman is cognizant of the particular risks, and the ability of the repairman to minimize such risks, should all be factored into and weighed in the "unreasonable risk" calculation....
No. 94-1868, at pp. 1-2, 9; 652 So.2d at 1300, 1304.
The party who moves for summary judgment has the burden of showing that there are no genuine issues of material fact, and that, based on the undisputed facts before the court, he is entitled to judgment as a matter of law. Only when the mover has made a prima facie showing of his entitlement to judgment as a matter of law does the burden shift to the opposing party to show *704 the existence of a material factual dispute. CCP Art. 966; Sanders v. Hercules Sheet Metal, Inc., 385 So.2d 772 (La.1980); Ledbetter v. Myers, 438 So.2d 700 (La.App. 2d Cir.1983).
Based on the facts before the court when Samuels moved for summary judgment, and on the law applicable to the various claims Carter has asserted or may assert against Samuels, we must conclude that genuine issues of material fact remain and that Samuels is not entitled to be dismissed from the action as a matter of law at this juncture. We reverse the summary judgment in Samuels' favor and remand for further proceedings.

CLAIM AGAINST EMPLOYER
Carter alleged two theories of tort liability against his employer, Firestone: failure to warn Carter of the dangers posed by the battery, and "failure to preserve the remains of the battery ... so that the exact cause of the explosion could be ascertained."
Pleading worker's compensation exclusivity and the statutory immunity from tort liability for work-related injuries (LRS 23:1032), Firestone filed the exception of no cause of action, which the trial court sustained without granting Carter leave to amend his petition. CCP Art. 934.
Carter effectively concedes that he cannot recover tort damages from his employer for the work-related bodily injuries he sustained on the day of the explosion. He also candidly admits that his petition may lack specific factual allegations to assert a cause of action against his employer for its alleged post-accident failure to preserve the battery remains for inspection and use in third-party litigation. Carter argues, however, that the tort immunity his employer enjoys with respect to the former claim does not extend to the latter, which involves conduct occurring after and apart from, though admittedly with some factual ties to, the work accident. We agree with his contention that he should be allowed to amend his petition to assert additional facts pertaining to Firestone's post-accident conduct.
Several recent Louisiana cases from other appellate circuits are cited by the litigants on the issue of "spoliation of evidence" or impairment of a civil claim: Williams v. General Motors Corp., 607 So.2d 695 (La.App. 4th Cir.1992); Kammerer v. Sewerage & Water Bd., 93-1232 (La.App. 4th Cir. 3/15/94), 633 So.2d 1357, writ denied; Morgan v. ABC Manufacturer, 93-701 (La.App. 5th Cir. 3/16/94) 637 So.2d 1076; Randolph v. General Motors Corp., 93-1983 (La.App. 1st Cir. 11/10/94), 646 So.2d 1019, writ denied.
The Louisiana cases have not considered the precise issue with which we are faced: whether and to what extent an employer may be sued in tort by an employee for failing to preserve evidence that may assist the employee in recovering tort damages from third parties for his work-related injuries.
These issues have been squarely addressed in other jurisdictions where the courts have consistently held that the employer's statutory immunity from tort liability to its employee for a work-related physical injury does not, of itself, shield the employer from a claim for economic injury that the employee may suffer as a result of the employer's post-accident conduct, whether intentional or negligent, that may impair the employee's ability to recover tort damages for his injuries from third parties. See, for example, Pirocchi v. Liberty Mutual Ins. Co., 365 F.Supp. 277 (E.D.Pa.1973) (applying Pennsylvania law); Coley v. Arnot Ogden Memorial Hosp., 107 A.D.2d 67, 485 N.Y.S.2d 876 (1985); and Wilson v. Beloit Corp., 869 F.2d 1162 (8th Cir.1989) (applying Arkansas law).
Once the employer's immunity threshold is crossed, the issue becomes the same for an employer-defendant as for any other defendant: Did the defendant have a duty to preserve the evidence for the plaintiff, whether arising from a statute, a contract, a special relationship between the parties, or an affirmative agreement or undertaking to preserve the evidence? See generally Edwards v. Louisville Ladder Co., 796 F.Supp. 966 (W.D.La.1992), and authorities cited therein. If so, the plaintiff has a cause of action for the defendant's breach of this duty. If not, the law does not afford the *705 plaintiff a cause of action. The courts have consistently held the plaintiff to a high standard of factual specificity regarding the source of the defendant's alleged duty to preserve evidence for the plaintiff's benefit, requiring a showing of something more than the general tort duty to act reasonably under the circumstances.
Compare Pirocchi, supra, and Miller v. Allstate Ins. Co., 573 So.2d 24 (Fla. 3d DCA 1990), review denied, both recognizing a cause of action based on the defendant's voluntary undertaking or express agreement to preserve the evidence, with Koplin v. Rosel Well Perforators, Inc., 241 Kan. 206, 734 P.2d 1177 (1987); Wilson v. Beloit Corp., 921 F.2d 765 (8th Cir.1990); and Edwards v. Louisville Ladder Co., supra, where the absence of a promise by the defendant to preserve the evidence, or of some other narrowly defined source of such a duty, resulted in dismissal of the claim for failure to state a cause of action.
We glean from these cases that the plaintiff who brings a claim for failure to preserve evidence may not simply make general allegations that the defendant had and breached a duty to preserve evidence, but must formally allege the specific source of that duty for his petition to withstand the exception of no cause of action.
This peremptory exception is triable solely on the face of the petition, without extrinsic evidence. CCP Art. 931; Fairfield Dev. Co. v. Jackson, 438 So.2d 664 (La.App. 2d Cir.1983). When the petition fails to state a cause of action but may be amended to cure the defect, the court shall grant the plaintiff leave to amend. Art. 934; Thornton v. Heritage Fed. Sav. & Loan Ass'n, 459 So.2d 115 (La.App. 2d Cir.1984).
The depositions of Carter and of Firestone's assistant store manager, Simmons, were before the trial court when Firestone's exception and Samuels' motion for summary judgment were decided. Simmons did not contradict, but corroborated, Carter's testimony that shortly after Carter's release from the hospital six days after the explosion, Carter asked Simmons and the store manager, Bourque, to hold the remains of the battery for him; they told him they would do so; the battery remains were kept in the store's supply room or warehouse for a period of time; and the remains "came up missing" several months later. We quote Simmons' testimony:
That battery was put back in the warehouse where we keep our ... new and junk batteries ... [Carter] was told that the battery would be there. In fact, [he and I] walked back there one day after he had got[ten] out of the hospital and came by. And the battery was back in the warehouse, separate, off to itself. [At a later time] someone called, an attorney, or somebody called, and I went back to take a quick look to see was the battery still back there and the battery was gone....
Q. Did you ever promise Mr. Carter that you would hold the battery for him?
You asked that question in December on the date [the store] was closing. And I told you no. And I went home and I was thinking it is a very [good] possibility that we did promise him that the battery would be there and not to worry about it.
Q. Okay. Who would be "we"?
Myself and Keith Bourque. I believe [Carter] talked to both of us on that.
Q. What exactly did you promise him?
... The only thing that I can recall, the battery was in the warehouse, and I told Carter not to worry about the battery. It would be there. There was no reason for it not to be there. (Our emphasis and brackets.)
In the face of this testimony, Carter should be allowed to amend his petition to allege with more particularity his claim against Firestone for failing to preserve the battery remains in accord with our discussion of this issue.

DECREE
The judgment sustaining Firestone's exception of no cause of action without leave to amend is affirmed in part, but only insofar as it relates to any conduct by Firestone that may have contributed to the explosion that caused Carter's work-related injury. With *706 respect to the claim relating to Firestone's post-explosion conduct concerning preservation of the battery remains, the judgment is affirmed in part, to the extent that it sustains the exception to Carter's original petition, and is amended in part, to grant Carter 15 days from the date this opinion becomes final to amend his petition in the trial court, in default of which amendment Carter's remaining claim against Firestone shall be deemed dismissed with prejudice.
The summary judgment dismissing Samuels from the action is reversed. The matter is remanded for further proceedings. Costs of the appeal are assessed one-half to Firestone and one-half to Samuels.
AFFIRMED IN PART, AMENDED IN PART, REVERSED IN PART.
SEXTON, J., concurs.