MOORE, J.
11 The plaintiffs, Woody Bilyeu, Mary Bilyeu and Patrick Shelton, appeal a summary' judgment that rejected their claims for insurance coverage and defense against National' Union Fire' Insurance Company of Pittsburgh (“National Union”) 'and Federal Insurance Company (“Federal”).' The plaintiffs also appeal a ruling that denied their motion to amend their ■ petition to “amplify” their claims against National Union and Federal, as well as to join other defendants. We affirm.

Factual Background

The Büyeus were owners of Comm-Craft Inc., a company founded in 1984 to install satellite dishes. .By 2003, the Bilyeus and Shelton were directors of Comm-Craft and of another satellite dish company, DirecTECH Inc. (“DT”), and trustees of these companies’ Employee Stock. Ownership Plans (“ESOPs”). In July 2004, the Büyeus sold their interest in DT and Comm-Craft, and the latter changed its name to DirecTECH Southwest (“DTSW”). . In 2005, Shelton resigned from DTSW.
Before they divested, however, the plaintiffs sold their shares in the companies’ ESOPs back to the ESOPs, in three transactions, December 31, 2003 (to the DT ESOP), March 19, 2004 (to the Comm-Craft ESOP)' and July 29, 2004 (to the DTSW ESOP). As trustees of the ESOPs, the plaintiffs essentially approved the transactions — and sales' ■ prices — with themselves: They maintained that after these sales, they had no further involvement- with the companies or with the ESOPs.-- . •
The new company, DTSW, and the’remaining company, DT, were rolled into a parent company, DirecTECH Holding Co. (“DTHC”), in June |g2005. As of that date, DTSW and DT became wholly owned subsidiaries of DTHC.
At this time, ..June 2005, DTHC purchased- — apparently for the first time — insurance policies from National Union; to cover the directors of its own, and of its subsidiaries’, ESOPs. DTHC bought two types of policies, Employee Benefit Plan Fiduciary Liability (“Fiduciary”) policies and Directors & Officers' Liability (“D & O”) policies. The first National Union Fiduciary policy had a policy period of July 15, 2005, to October 5, 2006, and its first D & O policy covered October 5, 2005, to October 5,2Ó06. Subsequent National Union policies provided coverage through December 31, 2008.' National Union issued a total of six policies to DTHC.
DTHC also purchased excess coverage from Federal, starting with a,Fiduciary policy effective October 5, 2006, to December 31, 2007, and Fiduciary and D & O policies effective from December 31, 2007, to December 31, 2008. Federal issued a total of three policies to DTHC.
These -nine policies are, of course, long and complex, but all exclude coverage for acts occurring before the effective dates of the policies. Also, all policies are “claims made and reported” policies, requiring the insured to report any claim to the insured during the policy period. . :
On September 6, 2007, Woody Bilyeu received a letter' from the - U.S. Department of Labor (“DOL”) stating that DOL was conducting an investigation of the pre-acquisition ESOPs “to determine whether any person has violated” any provision of ERISA Attached Was a subpoena seek *72 ing documents related to the finances of Comm-Craft, DT and their ^respective ESOPs. DOL sent a similar letter to Shelton on September 21, 2007. In April 2008, DOL asked all three plaintiffs to sign tolling agreements, essentially waiving the statute of limitations while DOL continued its investigation. All three plaintiffs signed. DOL ultimately sued the plaintiffs for ERISA violations, alleging that they sold their ESOP shares back to the ESOPs at grossly inflated prices.[1]
The plaintiffs formally demanded coverage from National Union on April 23, 2008, four months after the end of the 2006-07 policy period. National Union initially denied the claims, stating in May 2008 that the Comm-Craft and DT ESOPs were not covered plans under the D & O policy, and in July 2008 that there had been no claims made against the plaintiffs at that time. The plaintiffs also made a demand on Federal, which refused coverage on grounds that the primary policies had not been exhausted.

Procedural History

The plaintiffs filed this suit for declaratory judgment in January 2009 against National Union and Federal. They sought a declaration of their rights under the policies, with an order that the defendants provide coverage and a defense to DOL’s lawsuit. By amended petition filed two weeks later, the plaintiffs added DTHC, DTSW and another subsidiary as defendants.[2]
I ¿Federal had the case removed to U.S. District Court in February 2009, and it remained there until remanded in January 2011. Discovery was ambitious. For example, the plaintiffs sought an extension of time to respond to National Union’s request for production, alleging that it would exceed 500,000 pages. Nevertheless, the plaintiffs also sought to compel additional discovery from National Union and Federal.
In September 2011, Federal filed the instant motion for summary judgment on grounds that its liability as the excess carrier was not activated until the plaintiffs exhausted their primary coverage; that the named insureds in all its policies were DTHC and its ESOP, but none of the plaintiffs were ever officers or directors of those entities; and that even though the plaintiffs were officers or directors of acquired companies, coverage did not begin until the rollup, on July 31, 2004.
In June 2012, National Union filed its own motion for summary judgment on grounds that its policies excluded acts occurring before their effective dates, in 2005; and that the plaintiffs did not comply with the claims-made provision, as they received notice of the claim when they got the DOL letters and records subpoenas, in September 2007, but did not report it to National Union until April 2008, in a different policy period.
In response, the plaintiffs argued that the policies were ambiguous. For example, one Fidelity policy applied to a “plan,” but nowhere defined the term “plan.” Seizing on this alleged ambiguity, the plaintiffs pursued a prodigious course of discovery, seeking all “underwriting materials” of National Union, Federal, their *73 reinsurer, their brokers and agents, and | (¡details about all these entities’ computer software. (The district court granted most of the plaintiffs’ discovery requests.) They deposed numerous insurance agents and brokers, apparently in an effort to show that even if the policies excluded the plaintiffs or the three ESOP transactions, some of the brokers or agents had actually intended to cover them. The plaintiffs alleged that documents once existed to show that DTHC had requested policy provisions to cover the contested ESOP sales, but National Union intentionally or negligently destroyed them. The plaintiffs retained a forensics expert, a Dr. Johnette Hassell, who opined in a report that although National Union’s parent company, AIG, had a records retention policy, it was either ignored or inadequately managed, it lacked a policy for retaining email, and when requested, the underwriters simply failed to search for responsive documents. The plaintiffs urged that with the ambiguities in the policies, the mountain of underwriting materials, and the suspicion of spoliation, summary judgment was simply not appropriate.
The court held a hearing, limited to argument, on July 3, 2013. National Union focused on two arguments: (1) the policies were “claims made and reported” policies, the relevant policy period was 2006-07, and the plaintiffs failed to report the claims within that period, and (2) the policies excluded claims of which the insured had notice prior to the policy term, and the plaintiffs knew about the DOL claims before the effective date. It added that any argument that the plaintiffs “should have had different coverage” was irrelevant. Federal adopted these arguments.
IfiThe plaintiffs argued that the policies were ambiguous, and that the DOL letters and record subpoenas did not constitute notice under any policy. Mostly, however, they argued that National Union never produced all the discovery it once had. Counsel described numerous discovery items, including an AIG underwriter who wrote of a “problem” with the policy and said in deposition that D & O policies “automatically” covered all acts occurring before the continuity date, and another underwriter who “wanted to add” certain endorsements to certain policies, but failed to do so.
In April 2014, the court issued reasons for judgment, finding that the policies covered only those 'wrongful acts that occurred after the date the policies were issued, and that the DOL letters and subpoenas constituted a “claim made” which the plaintiffs did not report within the policy period. The court stated that it would grant summary judgment as prayed for.
Two days later, the plaintiffs advised the court .that certain discovery had not yet been completed. After a phone conference, the court rescinded its ruling and gave the parties 30 more days to finish discovery. The parties complied, filing their remaining discovery.
On May 14, 2014, the plaintiffs sought leave of court tó file a third supplemental and amending petition, to join two insurance brokers as defendants (alleging they failed to obtain the kind of coverage requested by DTHC) and to “amplify” their allegations of spoliation against National Union and Federal.
After a phone conference, the court ruled that the plaintiffs had known the identities and roles of the brokers for nearly five years, so there |7was no good cause to join them at that late date. The court added'that nothing would prevent the plaintiffs from filing a separate suit against them. The court further held that National Union and Federal had “tried to *74 comply” ■with all discovery orders; to allow the requested amendment would “simply extend an already burdensome litigation.” The court denied the motion to amend;
On August 15, the court issued “final reasons” for judgment, ruling that nothing in the additional discovery altered its earlier opinion. It denied all the plaintiffs’ outstanding motions and granted summary judgment dismissing National Union and Federal.
The plaintiffs have appealed, designating four assignments of error.
, General Principles
The motion for summary judgment is a procedural device used when there is no genuine issue of material fact for all or part of the relief prayed for by a litigant. Schultz v. Guoth, 2010-0343 (La.1/19/11), 57 So.3d 1002; Samaha v. Rau, 2007-1726 (La.2/26/08), 977 So.2d 880. A motion for summary judgment will be granted “if the pleadings, depositions, answers ,to , interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as.to material fact, and that mover is entitled to judgment as a matter of law.” La. C. Cr. P. art. 966 B(2). Appellate courts review motions for summary judgment de novo, using the same criteria that govern the district court’s consideration of whether summary judgment is appropriate. Peironnet v. Matador Res. Co., 2012-2292 (La.6/28/13), 144 So.3d 791; Schroeder v. Board of Sup’rs of La. State Univ., 591 So.2d 342 (La.1991).
 The interpretation of an insurance policy ordinarily' involves a ■ legal question that can be properly resolved on motion- for summary judgment. Bernard v. Ellis, 2011-2377 (La.7/2/12), 111 So.3d 995; Cutsinger v. Redfern, 2008-2607 (La.5/22/09), 12 So.3d 945. An insurance policy is a contract between the parties and should be construed using the general rules of interpretation of contracts set out in the Civil Code. Sensebe v. Canal Indem. Co., 2010-0703 (La.1/28/11), 58.So.3d 441; Edwards v. Daugherty, 2003-2103 (La.10/1/04), 883 So.2d 932. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties’ intent. La. C.C. art. 2046; Sensebe v. Canal Indem. Co., supra. Only if the policy cannot be construed simply, based on its language, because of an ambiguity, will the court look to extrinsic evidence to determine the parties’ intent. Doerr v. Mobil Oil Corp., 2000-0947 (La.12/19/00), 774 So.2d 119; Washington v. Savoie, 634 So.2d 1176 (La.1994). Just because a policy provides general coverage but then subjects it to certain exclusions does not make .the policy ambiguous. McCoy v. City of Shreveport, 49,428 (La.App. 2 Cir. 11/19/14), 152 So.3d 242, writ denied, 2014-2665. (La.3/13/15), 161 So.3d 640; Walpole v. Le Petit Théâtre du Vieux Carré, 2012 WL 12839 (E.D.La.2012).
After an answer to petition has been served, the plaintiff may amend the petition only by leave of court or by written consent of the adverse party. La. C.C.P. art. 1151. The law takes a . liberal approach to allowing |flamended pleadings to promote the interests of justice. Reeder v. North, 97-0239 (La.10/21/97), 701 So.2d 1291; Walton v. Burns, 47,388 (La.App. 2 Cir. 1/16/13), 151 So.3d 616. Amendment is generally allowed, provided the mover is acting in good faith, the amendment is not sought ás a delaying tactic, the opponent will not be unduly prejudiced, and trial of the issues will not be unduly delayed. Giron v. Housing Auth. of City of Opelousas, 393 So.2d 1267 (La.1981); Hibernia Nat’l Bank v. Antonini, 33,436 (La.App. 2 Cir. 8/23/00), 767 So.2d 143. The decision to allow or' disallow amendment 4s -within the trial court’s broad discretion. Giron v. *75 Housing Auth., supra; Short v. Short, 40, 136 (La.App. 2 Cir. 9/23/05), 912 So.2d 82, writ denied, 2005-2320 (La.3/10/06), 925 So.2d 519.
Louisiana does not recognize a-cause of action for negligent spoliation of evidence. Reynolds v. Bordelon, 2014-2362 (La.6/30/15), 172 So.3d 589. Even when an “agreement, contract, special relationship, or undertaking” exists between the parties, the “act of negligently spoliating evidence is so unintentional * * * that any recognition of the tort by the courts would not act to deter future conduct, but would, rather, act to penalize a party who was not aware of its potential wrongdoing in the first place,” Id. at 596, 597.

Discussion: Policy Exclusions

By their second assignment, the plaintiffs urge the court erred in finding the policies covered only those wrongful acts occurring' after the policies were issued. They concede that certain portions óf National Union’s 2Ó05-06 policies (“additional insureds” and “organizational |inchanges”) would appear to limit coverage to' acts occurring after those policies’ continuity date, but argue that the 2007-08 policies, which govern this case, do not contain these provisions. The plaintiffs also contend that these proyisions are inherently ambiguous, and that proper interpretation requires the use. of extrinsic evidence. Specifically, they quote an underwriter,, a Ms. McGee, who stated that the “organizational changes” provision “would not exclude prior acts of predecessor entities that .are now subsidiaries” of DTHC and that she “intended” to add an endorsement waiving notice requirements for terminated ESOPs. On de novo review, we find no merit to this assignment,

(1) The National Union Fiduciary Policies

The first National Union Fiduciary policy (July 15, 2005-October 5, 2006) lists a continuity -date of July 15, 2005, and sets out its insuring agreement (here and elsewhere, bold face in original for defined terms):
'Solely with respect to Claims first made against an Insured during the Policy Period * * * and reported to the insurer pursuant to 'the terms of this policy, and subject to the other terms, conditions and limitations of this policy, this policy shall pay the Loss of each and every insured arising from a Claim against an insured for any actual or alleged Wrongful Act by any such insured (or by any employee for whom ■such insured is legally responsible).
“Claim” is defined to include “any fact-finding investigation by the U.S. Department of Labor (or] the Pension Benefit Guaranty Corporation”; “wrongful act” includes “a violation of any of the responsibilities, obligations or duties imposed upon Fiduciaries by Employee Benefit Law with respect to a Plan[,]” The policy then sets out exclusions:
[HThe insurer shall not be liable to make any payment for Loss in connection with, a Claim made against an Insured(s):
H* ⅝
(e) alleging; arising out of, based upon or attributable to, as of the Continuity Date, any pending or prior: (1) litigation; or (2) administrative or regulatory proceeding or investigation of which an Insured had notice, -or alleging or derived from the same' or essentially the same facts as al- ' leged in such pending or prior-litigation or administrative or regulatory proceeding or investigation!/]
The policy also sets out special provisions' for organizational changes, stating that if the “Named -Sponsor” (DTHC) consolidates with, merges into, or sells all or *76 substantially all its assets to another person or entity, then the policy shall continue in force. It further states:
(b) Other organizational changes. In all events, coverage as is afforded under this policy with respect to a Claim made against any Sponsor Organization and/or any Insured thereof shall only apply for Wrongful Acts committed or allegedly committed after the effective time such Sponsor Organization became a Sponsor Organization and such Insured became an Insured, and prior to the effective time that such Sponsor Organization ceases to be a Sponsor Organization or such Insured ceases to be an Insured.
Both the later Fiduciary policies issued by National Union contain exactly the same provisions, except they list their respective continuity dates as October 5, 2006, and December 31, 2007.
A plain reading of these provisions shows that coverage is not afforded for this claim, as it arose from wrongful acts committed or allegedly committed before the time the sponsor organization (DTHC) became a sponsor organization and before the insureds (the plaintiffs) |12became insureds.[3] These provisions also show that coverage is extended to predéeessor entities (Comm-Craft and DT) only from the time they merged into the sponsor organization. Contrary to the plaintiffs’ assertion, the “other organizational changes” provision is present in all three National Union Fiduciary policies. Clearly designated as exclusions or provisions that apply “in all events,” these derogate from the general grant of coverage and do not make the policies ambiguous. There is no need to resort to extrinsic evidence for further interpretation. The National Union Fiduciary policies do not provide coverage for the claimed losses.

(2) The National Union D & 0 Policies

The first National Union D & 0 policy (October 5, 2005-October 5, 2006) lists a continuity date of October 5, 2006, and sets out its insurance agreement:
This policy shall pay the Loss of each and every Director, Officer or Employee of the Company arising from a Claim first made against such insureds during the Policy Period * * '* and reported to the Insurer pursuant to the terms of this policy for any actual or alleged Wrongful Act in their respective capacities as Directors, Officers or Employees of the Company except when and to the extent that the Company has indemnified such Insureds. The Insurer shall, in accordance with and subject to Clause 8, advance Defense Costs of such Claim prior to its final disposition.
“Wrongful act” is defined as “with respect to Individual Insureds, any breach of duty, neglect, error, misstatement, misleading statement, omission or act by such Insureds in their respective capacities as such, or any matter 113claimed against such Insured solely by reason of their status as directors, officers or Employees of the Company[J” The policy then sets out an exclusion almost identical to that in the Fiduciary policy:
The insurer shall not be liable to make any payment for Loss in connection with a Claim made against an Insured:
*77 [[Image here]]
(e) alleging, arising out of, based upon or attributable to as of the Continuity Date, any pending or prior: (1) litigation; or (2) administrative or regulatory proceeding or investigation of which an Insured had notice, or alleging any Wrongful'Act which is the same or Related Wrongful Act to that alleged in such pending' or prior litigation or administrative or regulatory proceeding or investigation[.]
[[Image here]]
(o) for violation(s) of any of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974 * * *.
In addition, Endorsement # 17, “Additional Insureds,” designated DT and DTSW as listed affiliates, with the proviso that the insurer shall not be liable for any loss:
(1)alleging, arising out of, based upon or attributable to as of such Affiliate’s respective Continuity Date, any pending or prior: (1) litigation; or (2)administrative or regulatory proceeding or investigation of which an Insured had notice, or alleging any Wrongful Act which is the same or Related Wrongful Act to that alleged in such pending or prior litigation or administrative or regulatory proceeding or investigation.
Both the later D & 0 policies issued by National Union contain the same provisions,. except that they list their continuity dates as October 5, 2006, and December 31, 2007, and that in the last policy, exclusion (o) is designated as exclusion (m) and amended by Endorsement # 7, without affecting the ERISA exclusion.
luA plain reading of these provisions shows that coverage- is not afforded for these claims, which are alleged ERISA violations under investigation by DOL. These provisions also show an exclusion, similar to that in the Fiduciary policies, for administrative or regulatory investigations that were pending or prior to the continuity date, of which DTHC, DT or DTSW had notice. Contrary to the plaintiffs’ assertion, the exclusions for ERISA claims and prior wrongful acts are present in all three National Union D & O policies. Clearly designated as exclusions, these derogate from the general. extension of coverage and do not make the policies ambiguous. There is no need to resort to extrinsic evidence for further interpretation. The National Union D & O policies do .not provide coverage for the claimed losses.

(3)The Federal Policies

The first Federal policy, a Fiduciary policy with a pending or prior date of October 5, 2006, sets out its insurance agreement:
The Company shall provide "the Insureds with insurance during the Policy Period excess of the Underlying Limit. Coverage hereunder shall attach only after the insurers of the Underlying Insurance shall- have paid in legal currency the full amount of the Underlying Limit for such Policy Period. Coverage hereunder shall then apply in conformance with the terms and conditions of the Primary Policy as amended by any more restrictive terms and conditions of any other policy designated in Item 4(B) of the Declarations, , except as otherwise provided herein.
The policy also contains this clause, “Pending or Prior Matters”:
The Company shall not be liable under this policy for any loss which is based upon, arises from or is in consequence of any demand, suit or other proceeding pending, or order, decree or judgment entered against any Insured *78 on or prior to the Pending or Prior Date set forth in Item 8 .of the | ^Declarations, or the same or any substantially similar fact, circumstance or situation underlying or alleged therein.
Both of Federal’s later policies, a Fiduciary policy and a D <& 0 policy effective December 31, 2007, to December 31, 2008, contain precisely the same provisions.
A plain' réáding of these provisions shows that Coverage is not afforded for these claims, as the plaintiffs concede that the underlying insurance (the National Union policies) have not been paid in the full amount to the underlying limit. Moreover, the claim arises from ÉSOP transactions that occurred between December 2003 and July 2004 and gave rise to the DOL investigation, before the pending or prior date set forth in the earliest Federal policy. Contrary-to the plaintiffs’ assertion-, -the -pending or prior matter provision appears in all Federal policies. Although this provision is not,labeled.as an exclusion, its clear import is an exclusion from coverage. As such, it does not create ambiguity with the coverage clause, and there is no need to resort to extrinsic evidence for further interpretation. The Federal policies do, not provide coverage for the claimed losses.

The “Claims Made and Reported” Requirement

By their first assignment of error, the plaintiffs urge the court erred' in finding-that receipt of the DOL records subpoena constituted a “claim made” and must be reported within the policy period. They concede that National Union’s 2007-OS Fiduciary policy defines a claim to include “Any .fact-finding investigation by the U.S. Department of Labor[,]” and that two.--of the plaintiffs “received contact” from DOL in September 2007. | ¶ (¡However, they argue they had-divested themselves from the companies in July 2004, had no. further involvement with them, had no company records, and were totally unaware of any investigation until they got the letters. They contend that notice of claim could not have occurred until DOL sent them the tolling agreements, in April 2008. They argue that merely identifying a wrongful act, without naming who did it, does not constitute a “claim.” MGIC Indem. Co. v. Home State Savings Ass’n, 797 F.2d 285 (6 Cir.1986); Bendis v. Federal Ins. Co., 958 F.2d 960 (10 Cir.1992); Winkler v. National Union Fire Ins. Co., 930 F.2d 1364 (9 Cir.1991). They also show that National Union initially denied coverage on the Fiduciary policy, July 11, 2008, on grounds that “there has been no claim made at this time.”' They contend that National Union should not be allowed to say there was no claim, and then to change its position to say there was.
In light of our finding that the prior and pending, other organizational changes and ERISA exclusions in the National Union policies, and the pending or prior exclusion in the Federal policies, all apply to the instant claims, it is not really necessary to analyze whether the plaintiffs complied with the “claims made and reported” requirements of the policies. We would note that Louisiana has long recognized the validity of “claims made” policies. Gorman v. City of Opelousas, 2013-1734 (La.7/1/14), 148 So.3d 888; Livingston Parish Sch. Bd. v. Fireman’s Fund Amer. Ins. Co., 282 So.2d 478 (La.1973). The application of the “claims made” provision depends on a reading of the policy. Williams v. SIF Consultants of La., 2013-972 (La.App. 3 Cir. 2/26/14), 133 So.3d 707; Reichert v. Bertucci, 94-1445 (La.App. 4 Cir. 1/31/95), 650 So.2d 821. Notably, in one of the cases cited by plaintiffs, Winkler, the court stated that the policy did not define “claim”; in the other two, *79 MGIC Indem. Co. and Bendis, the courts never quoted any policy definition of “claim,” and instead-resorted to ,text analysis and common law. Such is not the case here. ,
National Union’s Fiduciary policies defined “claim” to include “any fact-finding investigation by the U.S. Department of Labor.”[4] The DOL letter and subpoena advised that DOL was conducting an investigation to determine whether any person had violated any provision of ERISA. On de-novo review, we .find that these documents constituted notice of claim under the National Union .Fiduciary policy.
Finally, we are sensitive to the fact -that the DOL letters and subpoenas were addressed only to Woody Bilyeu and Patrick Shelton,- not to Mary Bilyeu. National Union argues that Ms. Huang, counsel for DTHC,,its ESOPs'.and subsidiaries, contacted DOL on behalf of all her clients by mid-December 2007 about complying with the subpoenas. Her letters, however, refer only to Woody Bilyeu and Patrick Shelton. In other circumstances a DQL letter and subpoena to Ms. Bilyeu, individually, might have been necessary to. constitute notice of claim; however, given that coverage was excluded by other provisions, of the policies, we decline to address this issue. This assignment of error does not present reversible error.
) XRCluim of Spoliation
By their third assignment of error, the plaintiffs urge the court erred in failing to consider National Union’s destruction of underwriting materials, for purposes of the adverse presumption, making summary judgment improper. The plaintiffs argue that National Union did not produce these materials until November 2011, and that emails between the underwriter -and broker were missing. They cite the adverse presumption rule: -,a litigant’s failure to produce evidence that is available to him creates a presumption that the evidence would have been detrimental to his case. Critton v. State, 43,328 (La.App. 2 Cir. 6/4/08), 986 So.2d 207, writ denied, 2008-1493 (La.10/3/08), 992 So.2d 1019. They also argue that Louisiana recognizes a tort claim for negligent spoliation, citing Arnold v. Brookshire Grocery Co., 2009-44 (La.App. 3 Cir. 5/6/09), 10 So.3d 1279. They contend that National-Union’s ree-ords-retention policy was an “affirmative agreement or undertaking to preserve the evidence,” creating an enforceable duty. Acadian Gas Pipeline Sys. v. Nunley, 46,648 (La.App. 2 Cir. 11/2/11), 77 So.3d 457, writ denied, 2011-2680 (La.2/10/12), 80 So.3d 487. In support, they cite Dr. Has-sell’s,opinion that National Union’s underwriters did not comply; with the retention policy and failed to search their email files. They contend that until all. the requested evidence is produced, summary judgment is not proper.
At the outset, we note that the kind of writings alleged to be missing — underwriting materials and, internal emails— would constitute extrinsic evidence, admissible only if the policies were ambiguous. La. C.C. art. 2046; Sensebe v. Canal Indem. Co., supra; Doerr v. Mobil Oil Corp., supra. In light of our finding that these policies are not ambiguous and, in fact, exclude the plaintiffs’ claims, there is simply' no need for us to consider the potential effect of the allegedly missing documents.
We also must note that after briefs were filed in this case, the supreme court held that Louisiana does not recognize a tort of *80 negligent spoliation of evidence. Reynold v. Bordelon, supra. The court held that a specific duty may arise “due to an agreement, contract, special relationship, or undertaking which was formed between the parties specifically for the purpose of preserving the evidence.” Id. at 596. Nevertheless, applying general tort concepts and doctrinal sources, the court concluded:
We find the act of negligently spoliat-ing evidence is so unintentional an act that any recognition of the tort by the courts would not act to deter future conduct, but would, rather, act to penalize a party who was not aware of its potential wrongdoing in the first place. Id. at 597.
In so holding, the court explicitly overruled a case from this court, Carter v. Exide Corp., 27,358 (La.App. 2 Cir. 9/29/95), 661 So.2d 698.[5] We will not revisit the issue. The claim of negligent spoliation is without merit. Furthermore, Dr. Hassell’s report found that National Union’s parent company, AIG, had a records retention policy but that it was either ignored or inadequately managed; it lacked a policy for retaining email; and underwriters failed to search for responsive documents. Indulgently read, this report found negligent conduct, not the intentional destruction required | gnto prove spoliation.
This assignment does not present reversible error.

Motion to Amend

By their fourth assignment of error, the plaintiffs urge the district court erred in failing to liberally consider their amended petition pursuant to the standards set forth in Hibernia Nat’l Bank v. Antonini, supra. They show that their proposed third supplemental and amending petition sought merely to (1) amplify the existing claims against National Union and Federal by specifying that the plaintiffs incurred costs in defending the DOL matter and paid a settlement pursuant to a consent judgment and order with DOL, (2) add a claim against National Union for spoliation of the evidence, and (3) add two insurance brokers as defendants on grounds that they failed to obtain, the coverage requested by the plaintiffs and then failed to advise the plaintiffs of this failure. They argue that amendment should be allowed in the interest of justice, as these claims all arose from the same transactions, conduct and occurrence at issue in the original petition. Finally, they argue prejudice in that an amended claim adding the brokers would relate back to the original petition, La. C.C.P. art. 1153, while a new petition would likely meet an exception of prescription.
The plaintiffs have never alleged intentional spoliation of evidence, only negligence; because the law does not recognize a claim for negligent spoliation, there is no legal basis for the second ground of amendment. Reynolds v. Bordelon, supra.
12iAs for the first ground of amendment, we find no abuse of the district court’s discretion. The original petition alleged that National Union and Federal “owe a duty to defend petitioners” and “are contractually bound to pay any loss occurring to petitioners as insureds, regarding any claim by the DOL.” This broad allegation easily includes the special damages of costs and a settlement with DOL. Under *81 Louisiana’s fact-pleading system, the original allegation was sufficient to place special damages at issue. Giron v. Housing Auth. of Opelousas, supra. The court did not abuse its discretion' in finding the amendment unnecessary. ‘
As for the third ground of amendment, reviewing the Giron factors, we agree there is no showing of bad faith on the plaintiffs’ part. However, the plaintiffs knew the identities of the brokers, and their failure to procure the desired coverage, for nearly five years before seeking to join them as defendants; they moved to amend after the district court had issued reasons for -judgment granting National Union’s and Federal’s motions for summary judgment, and only a week after the court rescinded that ruling to permit a final round of discovery. These facts create an inference that the motion for leave to amend was intended to delay the inevitable dismissal of the major defendants; they fully support the court’s finding that the move was untimely. The court also did riot abuse its discretion in finding, with commendable restraint, that this litigation was “already burdensome”; it logs in at over 3,300 pages of district court filings, over 800 pages of trial exhibits, and four CDs containing over 1 Gigabyte of data, much of it duplicative. The district court was within its discretion to find that allowing hrihe amendment would be unduly prejudicial to the opposing parties. This assignment of error does not present reversible error.

Conclusion

For the reasons expressed, the summary judgment in favor of National Union Fire Insurance Co. of Pittsburgh and Federal Insurance Co. is affirmed. The ruling denying the plaintiffs’ motion for leave of court to file a third -supplemental and amending- petition is also affirmed. All costs are to be paid by the plaintiffs, Woody D. Bilyeu, Mary H. Bilyeu and Patrick B. Shelton.
AFFIRMED.
BROWN, C.J., concurs.
APPLICATION FOR REHEARING
Before BROWN, MOORE, LOLLEY, GARRETT, and CALLOWAY, JJ.
Rehearing denied.
BROWN, C.J., would grant rehearing.

. For example, in the July 29, 2004, sale, Mary Bilyeu sold 55,046 shares of DTSW ESOP to the ESOP for $54.55 a share; DOL alleged this was “more than 30 times the amount” other ESOP shareholders paid for shares just two days earlier. This would be roughly a $2.9 million loss for the ESOP. DTSW had just lost its contract to install satellite dishes for DirecTV, leading to the collapse of its share prices.

. The plaintiffs settled with DTHC in July 2013, reserving their rights against the other defendants.

. This provision is consistent with the Louisiana jurisprudence of "fortuity,” under which "no insurance company would have issued a policy covering an accident which had occurred prior to making an application for insurance.” Brignac v. City of Monroe, 41,207 (La.App. 2 Cir. 7/26/06), 936 So.2d 272, writs denied, 2006-2154 (La.12/8/06), 943 So.2d 1095, 2006-2165 (La.12/8/06), 943 So.2d 1096; Looney Ricks Kiss Architects Inc. v. Bryan, 2014 WL 931781 (W.D.La.2014).

. The-definition of "claim” in National Union’s D & O policy is more restrictive, referring to “an administrative or investigatory investigation when conducted by the [EEOC],” but it elsewhere specifically excludes ERISA violations.

. We would also consider as overruled any other cases suggesting the validity of a claim for negligent spoliation, such as Arnold v. Brookshire Co., supra, and the cases cited therein, Kammerer v. Sewerage & Water Bd., 93-1232 (La.App. 4 Cir. 3/15/94), 633 So.2d 1357, writ denied, 94-0948 (La.7/1/94), 639 So.2d 1163, and Williams v. General Motors Corp., 607 So.2d 695 (La.App. 4 Cir.1992).